1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | CASE NO. C13-1866JLR |
| Plaintiff, | ORDER DENYING MOTION TO INTERVENE |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## I.    INTRODUCTION

17

18

19

20

21

22

Before the court is the Western States Petroleum Association and the American

Petroleum Institute's (collectively, "Proposed Intervenors") motion to intervene pursuant

to Federal Rule of Civil Procedure 24.  (*See* Mot. (Dkt. # 14).)  In this case, Plaintiff

Center for Biological Diversity ("CBD") challenges the United States Environmental

Protection Agency's ("EPA") decision to approve Washington's and Oregon's lists of

"impaired waters" under Section 303(d) of the Clean Water Act,  33 U.S.C. 1313(d). (*See generally* Compl. (Dkt. # 1).)  CBD opposes the motion to intervene in its entirety; Defendants oppose the motion to the extent it requests intervention as of right under Federal Rule of Civil Procedure 24(a)(2).  (*See* CBD Resp. (Dkt. # 18); EPA Resp. (Dkt. # 19).)  Having considered all submissions in favor of and against the motion, the balance of the record, and the relevant law, and no party having requested oral argument, the court denies the motion to intervene, but grants amicus curiae status to the Proposed Intervenors.

## II.     BACKGROUND

### A.     Clean Water Act

Congress enacted the Clean Water Act ("CWA") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a).  The CWA prohibits discharges of pollutants from point sources into water bodies absent compliance with a national pollution discharge elimination system ("NPDES") permit.  33 U.S.C. § 1311(a); 1362(12), (14).  A NPDES permit allows the holder to discharge pollutants at levels below thresholds incorporated in the permit; a permit may include both technology-based and water quality criteria standards. 33 U.S.C. § 1311(b), 1342(a); 40 C.F.R. § 122.1 et seq.  The states of Washington and Oregon administer NPDES permits for point sources within their jurisdiction.  *See generally* Wash. Admin. Code 463-76-005 et seq.; Or. Admin. R. 340-041-0001 et seq.

### 1.  Water quality standards

The CWA also requires each state to establish water quality standards for bodies of water within the state's boundaries.  33 U.S.C. § 13131(a)-(c).  These standards include (1) designated beneficial uses for waters, (2) narrative and/or numeric water quality criteria, which define the amounts of pollutants permissible to maintain the designated beneficial uses, and (3) anti-degradation requirements, which protect existing in-stream uses and high quality waters.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.10-12.

### 2.  Section 303(d) list of impaired waters

Section 303(d) of the CWA requires states to establish a list of impaired or threatened water bodies within their boundaries for which existing pollution controls are not stringent enough to meet the applicable water quality standards.  33 U.S.C § 1313(d)(1); 40 C.F.R. § 130.7.  States must submit this list every two years to EPA for approval; EPA must approve, disapprove, or partially disapprove a state's list within 30 days of its submission.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).  If EPA disapproves a state's list, EPA must within 30 days of the date of disapproval establish a list of waters that should have been listed as impaired.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).  EPA must solicit and consider public comment on such listings.  40 C.F.R. § 130.7(d)(2).

### 3.  Total maximum daily loads

For waters listed as impaired on the section 303(d) list, the state must establish a total maximum daily load ("TMDL") for a pollutant "preventing or expected to prevent

1   attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii); 33 U.S.C.

2   § 1313(d)(1)(C).  A TMDL defines the maximum amount of a pollutant that can be added

3   to an impaired water body from all combined sources without exceeding water quality

4   standards.  *See Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1520 (9th Cir.

5   1995).  EPA must approve or disapprove TMDLs established by states.  33 U.S.C.

6   § 1313(d)(2).  TMDLs themselves do not regulate specific sources of pollutants, but

7   instead inform the design and implementation of other pollution control measures, such

8   as individual discharge permits and state water quality management plans.  *See*

9   *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002); 33 U.S.C. § 1313(e); 40

10  C.F.R. § 130.6.

11  **B.    CBD's Allegations**

12      Ocean acidification occurs when the chemistry of seawater is altered such that it

13  becomes more acidic and its pH declines. (Compl. ¶ 40.)  Absorption of carbon dioxide

14  from the atmosphere is one cause of ocean acidification.  (*Id.*)  Ocean acidification can

15  pose a threat to marine animals and ecosystems because, among other things, it impairs

16  the ability of organisms, such as oysters and coral, to build calcium-carbonate-based

17  shells and other skeletal structures.  (*Id.* ¶ 50.)  CBD alleges that Washington's and

18  Oregon's coastal waters are especially vulnerable to ocean acidification.  (*Id.* ¶ 43.)

19      Both Washington and Oregon have established water quality standards that are

20  relevant to ocean acidification.  (*Id.* ¶¶ 56-57, 67 (citing Wash. Admin. Code  Ch. 173-

21  201a; Or. Admin. R  Ch. 340-041).)  CBD alleges that because Washington and Oregon's

22  ocean waters do not attain certain of these water quality standards, "each segment" of the

1    states' coastal waters should be included the states' respective Section 303(d) lists of

2    impaired waters.  (*Id.* ¶¶ 66, 75.)

3         EPA approved Washington's Section 303(d) list of impaired waters on December

4    21, 2012, and Oregon's Section 303(d) list of impaired waters on December 14, 2012.

5    (*Id*. ¶¶ 36, 39.)  Neither of these lists identifies any coastal waters as threatened or

6    impaired by ocean acidification.  (*Id.* ¶¶ 34, 38.)

7         Accordingly, CBD filed this action requesting (1) a declaration that EPA's

8    decision to approve Washington and Oregon's Section 303(d) lists of impaired waters

9    was arbitrary and capricious and either (2) an order compelling EPA to disapprove of

10   Washington and Oregon's lists and identify waters impaired by ocean acidification within

11   30 days or (3) an order vacating and remanding the approvals to EPA for a new

12   determination.  (*Id.* § VIII.)

13   **C.     Motion to Intervene**

14        The Western States Petroleum Association and the American Petroleum Institute

15   (collectively, "Proposed Intervenors") now move to intervene in this action.  (*See*

16   *generally* Mot.)  The Western States Petroleum Association is a non-profit private trade

17   association that represents the interests of the petroleum and petroleum-products industry

18   in Washington, Oregon, Arizona, California, Nevada, and Hawaii.  (Holmes Dec. (Dkt.

19   # 15).)  The American Petroleum Institute is a national trade association representing

20   over 500 member companies involved in all aspects of the oil and natural gas industry.

21   (Schild Dec. (Dkt. # 17).)  Both organizations include member companies who own and

22   operate refineries in the State of Washington that discharge treated industrial wastewater

into marine waters pursuant to NPDES permits issued by the State of Washington. (Holmes Dec. ¶¶ 5-7; Schild Dec. ¶¶ 3-5, Exs. A-D.)  CBD opposes the Proposed Intervenors' motion on all grounds; EPA opposes the Proposed Intervenors' attempt to intervene as of right, but takes no position as to their request for permissive intervention. (*See generally* CBD Resp.; EPA Resp.)

### III.    ANALYSIS

**A.    Intervention as of Right**

Intervention as of right is governed by Federal Rule of Civil Procedure 24(a)(2). When analyzing a motion to intervene of right, courts apply a four-part test:

> (1) the motion must be timely;
> (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action;
> (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and
> (4) the applicant's interest must be inadequately represented by the parties to the action.

*Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011).  On a motion to intervene, a district court must accept as true the nonconclusory allegations of the motion and proposed answer.  *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001).  The Ninth Circuit construes Rule 24(a) liberally in favor of potential intervenors.  *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440-41 (9th Cir. 2006).  The party seeking to intervene bears the burden of showing that all of the requirements for intervention have been met.  *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004).

1    Here, Plaintiff and Defendant do not challenge the timeliness of Proposed

2  Intervenors' motion.  (*See generally* CBD Resp.; EPA Resp.)  However, as discussed in

3  the following sections, Proposed Intervenors fail to establish a significantly protectable

4  interest relating to the subject of the action such that the disposition of the action may

5  impair its ability to protect that interest.  Because Proposed Intervenors' bid for

6  intervention as of right fails at the second and third elements, the court does not reach the

7  fourth and final element of inadequate representation.

8    **1.  Significant protectable interest**

9    "An applicant has a 'significant protectable interest' in an action if (1) it asserts

10  an interest that is protected under some law, and (2) there is a 'relationship' between its

11  legally protected interest and the plaintiff's claims."  *Lockyer*, 450 F.3d at 440-41

12  (quoting *Donnelly v. Glickman,* 159 F.3d 405, 409 (9th Cir. 1998)).  To merit

13  intervention as of right, the interest must be "direct, non-contingent, substantial and

14  legally protectable."  *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002),

15  *modified by* 307 F.3d 943 (9th Cir. 2002) (quoting *Dilks v. Aloha Airlines*, 642 F.2d

16  1155, 1157 (9th Cir. 1981)).  There is a sufficient relationship between the interest and a

17  plaintiffs' claims if the "relief sought by the plaintiffs will have direct, immediate, and

18  harmful effects upon a third party's legally protectable interests."  *Conservation Council*

19  *v. U.S. Forest Service,* 66 F.3d 1489, 1494 (9th Cir. 1995), *abrogated by Wilderness Soc.*,

20  630 F.3d 1173.

21    A NPDES permit can be a significant protectable interest.  *See Sierra Club v.*

22  *EPA*, 995 F.2d 1478, 1486 (9th Cir. 1993) *abrogated by Wilderness Soc.*, 630 F.3d 1173

1   (finding that city could intervene in action seeking to compel EPA to establish new

2   permits for city's wastewater treatment plants).  However, unlike the underlying

3   environmental action in *Sierra Club*, this action does not directly challenge any existing

4   permit.  (*See* Compl. ¶¶ 77-79 (Claims for Relief).)  Instead, Proposed Intervenors argue

5   that they have a significant protectable interest in this suit because some of their members

6   will face various forms of stricter or additional regulation if CBD prevails.  (Mot. at 6-9.)

7   Proposed Intervenors claim that these members "would likely incur significant increased

8   capital and operating costs necessary to comply" with these new regulatory requirements.

9   (Holmes Dec. ¶¶ 8; *see also* Schild Dec. ¶¶ 6-10.)  This court addressed—and rejected—a

10  similar argument in this suit's predecessor, an action by CBD against EPA regarding the

11  omission of coastal waters from Washington's 2008 Section 303(d) list.  *See Center for*

12  *Biological Diversity v. EPA*, Case No. 09-civ-0670-JCC (W.D. Wash., filed May 14,

13  2009) Dkt. # 29 (hereinafter "Previous Intervention Order").  Proposed Intervenors'

14  current variations of this argument are likewise insufficient.

15          **a.  TMDL**

16          Although Judge Coughenour dispensed with this theory in the predecessor lawsuit,

17  Proposed Intervenors again argue that the TMDL requirement creates a significant,

18  protectable interest in this action.  (*See* Previous Intervention Order at 7; Mot. at 9 n.8.)

19  This court agrees with Judge Coughenour that the TMDL requirement does not establish

20  a direct, non-contingent interest that merits intervention as of right.

21          Proposed Intervenors' theory is that any revision of the Section 303(d) lists to

22  include coastal waters will require the states to establish TMDLs and submit the TMDLs

to EPA for approval.  *See* 40 C.F.R. § 130.7(c)(1)(ii); 33 U.S.C. § 1313(d).  Once a

TMDL is approved, it "serves as an informational tool or goal for the establishment of

further pollution controls."  *City of Arcadia v. EPA*, 411 F.3d 1103, 1105 (9th Cir. 2005).

According to Proposed Intervenors, a decrease in pollution limits in its members' NPDES

permits would then be imminent.  (*See* Mot. at 9 n.8.)

Although it is true that, absent a finding that EPA's approval of the list was

arbitrary and capricious, Proposed Intervenors' permits will likely remain the same, the

connection between this lawsuit and any decrease in permit limits is too attenuated to

satisfy Rule 24(a).  *See Our Children's Earth Found. v. EPA*, C 05-05184 WHA, 2006

WL 1305223, at *3 (N.D. Cal. May 11, 2006) ("Without a review process, of course, the

standards will remain the same, thus preventing increases in pollution-control spending at

refineries.  The connection between this lawsuit and any potential increase is, however,

too vague, attenuated and contingent to satisfy Rule 24(a).")  A TMDL "does not, by

itself, prohibit any conduct or require any actions.  Instead, each TMDL represents a goal

that may be implemented by adjusting pollutant discharge requirements in individual

NPDES permits or establishing nonpoint source controls."  *City of Arcadia v. EPA*, 265

F. Supp. 2d 1142, 1144 (N.D. Cal. 2003).  Although NPDES permits must, as a whole,

contain limitations that are consistent with the wasteload allocations established in

TMDLs, *see* 40 CFR §122.44(d)(1)(vii), the state retains discretion in determining how

the pollutant load is allocated among the various sources that discharge into an impaired

water.  *See, e.g.*, *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002).  As a result,

several steps—steps that involve nebulous "goals" and the discretion of two public

1  agencies—lie between a listing of coastal waters and any permit restrictions imposed due

2  to the TMDL requirement.  *See* Previous Intervention Order at 5.  This situation does not

3  implicate the "direct, non-contingent" interest necessary to justify intervention as of right.

4  *See S. Cal. Edison*, 307 F.3d at 803.  Therefore, the court rejects this argument.

5  **b.  Increased restrictions in reissued NPDES permits**

6  Proposed Intervenors next argue that, regardless of the development of a TMDL, a

7  finding in CBD's favor will necessarily tighten restrictions in their members' future

8  NPDES permits because the refineries will no longer be able to argue that certain coastal

9  waters meet certain water quality standards applicable to ocean acidification.  (Mot. at 6-

10  9 and Reply (Dkt. # 20) at 2-4.)  According to the CWA's implementing regulations, each

11  NPDES permit "shall include . . . any requirements in addition to or more stringent than

12  promulgated effluent limitations guidelines . . . necessary to (1) achieve water quality

13  standards . . . including State narrative criteria."  40 CFR § 122.44(d)(1).  Specifically,

14  the limitations in a NPDES permit "must control all pollutants . . . which the Director

15  determines are or may be discharged at a level which will . . . contribute to an excursion

16  above any State water quality standard, including State narrative criteria for water

17  quality."  *Id.* § 122.44(d)(1)(i).  NPDES permits must be reissued at least every five

18  years.  *Id.* § 122.46(a).  As such, although a finding of impairment would not

19  immediately affect existing permits, upon reissuance the permit's pollutant thresholds

20  could potentially be revised downward to ensure the discharges do not contribute to

21  excursions above certain water quality standards.

22

1    However, the "possibility that this lawsuit could lead to more stringent regulations

2  does not constitute a direct, substantial, legally protectable interest in this lawsuit."  *Ctr.*

3  *for Biological Diversity v. EPA*, C-11-06059 YGR, 2012 WL 909831, at *4 (N.D. Cal.

4  Mar. 16, 2012).  In *Center for Biological Diversity v. EPA*, the court found that the

5  possibility that a suit to compel EPA to review Clean Air Act regulations "could lead to a

6  process that may change those regulations creates, at best, a remote economic interest in

7  this litigation.  A remote interest does not provide for intervention as a matter of right."

8  *Id.*  That same principle applies here.  Revision of members' permits, which will be

9  determined not by this lawsuit but at the discretion of state and federal administrative

10 agencies and via intervening regulatory processes, is too remote to merit intervention as

11 of right.

12   Proposed Intervenors present a stylized example suggesting that, if for some

13 reason EPA found that the existing average pH of Washington's marine waters (currently

14 8.1) was categorically unacceptable to meet water quality standards, all permits allowing

15 discharges with a pH from 6.0-9.0 would have to be revised.  (Mot. at 7.)  The reality is

16 not so clear-cut; Proposed Intervenors over-simplify both the science and the law.  First,

17 average pH is only one indicator of ocean acidification's biological impacts; ocean

18 acidification implicates numerous other water quality standards, including narrative water

19 quality criteria.  (*See* Compl. ¶¶ 56-57.)  For that reason, adjusting the pH of discharge

20 permits is but one of many ways in which ocean acidity can be improved and the effects

21 of ocean acidification mitigated.  (*See* CBD Resp. at 8 (listing remedies including

22

ORDER- 11

1   programs to reduce land-based nutrient runoff and habitat management measures to

2   buffer the impacts of ocean acidification).)

3         Second, it is not possible to predict whether a finding in CBD's favor on the merits

4   of this action will lead to revisions in any particular NPDES permits.  Upon a ruling that

5   EPA's approval of the lists was arbitrary and capricious, CBD requests either an order for

6   EPA to disapprove the lists and identify impaired coastal waters or a remand for EPA to

7   reconsider the lists.  (Compl. § VIII.)  Either way, whether any given permit will be

8   modified ultimately depends on a host of factors, including:  which waters EPA

9   determines are impaired, which water quality standards those waters fail to meet, which

10  remedies state agencies choose to employ to address those standards, and, in the event

11  permit modification is selected as a remedy, whether the state agency responsible for

12  reissuing permits determines that an entity in fact discharges pollutants "at a level which

13  will . . . contribute to an excursion above" the applicable state water quality standard, 40

14  CFR §122.44(d)(1)(i).  Due to these intervening administrative determinations, the relief

15  sought by plaintiffs does not have the "direct, immediate" effects upon NPDES permits

16  necessary to justify intervention as of right.  *See Conservation Council*, 66 F.3d 1494.

17        Not only that, but as of now, every entity that possesses a permit to discharge into

18  Washington or Oregon's coastal waters faces the same theoretical possibility that a chain

19  of regulatory events occurring after the conclusion of this suit could lead to modifications

20  of their permits upon reissuance.  "[A]n undifferentiated, generalized interest in the

21  outcome of an ongoing action is too porous a foundation on which to premise

22  intervention as of right."  *S. California Edison*, 307 F.3d at 803 (quoting *Pub. Serv. Co.*

1    *of N.H. v. Patch*, 136 F.3d 197, 205 (1st Cir. 1998)); *see also ManaSota-88, Inc. v.*

2    *Tidwell*, 896 F.2d 1318, 1322 (11th Cir. 1990) (finding that the "generalized grievance"

3    of industry members facing potential permit modifications did not constitute a

4    significantly protectable interest in a suit to force EPA to list impaired waters).  Here,

5    Proposed Intervenors' generalized interests in avoiding potentially stricter NPDES permit

6    limitations are simply too remote from the substance of this litigation to merit

7    intervention as of right.  *See Or. Envtl. Council v. Or. Dep't of Envtl. Quality*, 775 F.

8    Supp. 353, 358 (D. Or. 1991) (finding that regulated entities' economic interests were not

9    directly related to suit seeking an order requiring state to comply with Clean Air Act

10   implementation plan when granting permits).

11              **c.  Conditions in existing NPDES permits**

12              Proposed Intervenors also contend that including coastal waters on the Section

13   303(d) list will trigger stricter provisions in some members' existing permits.  (Reply at

14   2-3.)  Specifically, one member's general permit for discharge of construction stormwater

15   provides that "operators of construction sites that discharge to a 303(d)-listed water body

16   are not eligible for coverage under this permit *unless* the operator" shows either that (i)

17   the stormwater was not exposed to any pollutant for which the water is listed as impaired;

18   (ii) the pollutants for which the water body is impaired are not present at the site; or (iii)

19   for non-TMDL listed waters, the new discharge meets water quality standards at the point

20   of discharge.  (Phillips 66 Permit (Dkt. # 17-3) at 22-23 (emphasis in original).)

21   Proposed Intervenors argue that their member has a significantly protectable interest in

22   avoiding these additional conditions.  (Reply at 2-3.)  Assuming that a wish to avoid

complying with existing permit restrictions constitutes a significant interest protectable under law, Proposed Intervenors overlook that the permit also provides:

> All references and requirements associated with Section 303(d) of the Clean Water Act mean the most current listing by Ecology of impaired waters (Category 5) that exists on January 1, 2011, or the date when the operator's complete permit application is received by Ecology, whichever is later.

(*Id.* at 22.)  The permit was issued December 1, 2010.  (*Id.* at 1.)  Because any listing of coastal waters initiated by this lawsuit would necessarily occur after January 1, 2011, and after the date of the complete permit application, it does not appear that the listing would work any immediate change to the regulated entity's status under the terms of the permit.[1]  As such, this provision does not establish a significantly protectable interest.[2]

_____

[1] To the extent that a listing of impaired coastal waters would, due to a permittee's inability to meet the three conditions, necessitate an application for a new permit, such concerns are addressed in the preceding Section III(A)(1)(b).

[2] In the event that the restrictive conditions in members' permits can in fact be triggered by impaired listings made after January 2011, Proposed Intervenors have not carried their burden to make a compelling showing that EPA's representation of this interest would be inadequate.  The "most important factor in determining the adequacy of representation is how the [applicant's] interest compares with the interests of existing parties."  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003).  "When an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises," and a compelling showing is required to demonstrate inadequate representation.  *Id.*
When it comes to avoiding restrictive conditions in existing permits, Proposed Intervenors' ultimate objective is aligned with EPA's ultimate objective, namely, to uphold EPA's approval of Washington's and Oregon's Section 303(d) impaired waters list.  Proposed Intervenors insist they have a "significantly different" perspective from EPA (Mot. at 12), but make no showing that EPA is unwilling or incapable of fully defending its decision to approve the Section 303(d)lists.  The court is not required to accept conclusory allegations contained in applicants' motion to intervene.  *Sw. Ctr. for Biological Diversity*, 268 F.3d at 819.  For this reason, also, conditions in existing permits are not a basis for granting intervention as of right.

1            **d.  Carbon dioxide emissions regulation**

2          Proposed Intervenors argue that CBD's ultimate goal is to use a Section 303(d)

3  listing of coastal waters to pursue the establishment of a TMDL for airborne carbon

4  dioxide emissions.  (Mot. at 10.)  The recent establishment of a TMDL program for

5  mercury emissions in the northeastern United States, as well as CBD's statements in its

6  complaint, response brief, and letters to EPA, lend credence to that assertion.  (*See*

7  Compl. ¶¶ 40-41, 49, 54; CBD Comment Letter (Dkt. # 16-1) at 11; CBD Resp. at 8.)

8  Proposed Intervenors argue that their constituents, as members of the oil, natural gas, and

9  petroleum industries, have an economic interest in avoiding carbon dioxide emission

10  regulations in any form.  (Holmes Dec. ¶ 9; Schild Dec. ¶ 8.)

11          Be that as it may, any such eventual regulation falls outside the scope of this

12  litigation.  Plaintiff's requested relief implicates only EPA's decision to approve

13  Washington and Oregon's Section 303(d) lists.  (*See* Compl. § VII.)  The question of

14  which remedies should be applied to impaired coastal waters (to the extent any waters are

15  found to be impaired) will rest squarely with the states' regulatory agencies.  As

16  discussed above, the states have at their disposal numerous regulatory tools for

17  addressing impairment, and regulation of airborne pollutants is by no means the most

18  obvious or likely.  (*See* CBD Resp. at 8 (listing possible mechanisms for combating

19  ocean acidification).)  To the extent it is CBD's end game to pursue a TMDL for carbon

20  dioxide emissions, that is a game that will be played on a different field.  Proposed

21  Intervenors' concerns about future regulation of carbon dioxide emissions are too

22

1  speculative—and too tangentially related to the merits of this action—to justify

2  intervention as of right.  *See Ctr. for Biological Diversity*, 2012 WL 909831, at *4.

3       **e.  Value of Real Property**

4       Proposed Intervenors argue briefly that a finding that EPA was arbitrary and

5  capricious to approve Section 303(d) lists that do not include impaired coastal waters will

6  lead to a decline in value of their members' real property.  Proposed Intervenors provide

7  no explanation as to why such a decision would affect the value of the land on which

8  their members' refineries are located, and they identify no other specific property that is

9  in jeopardy.  On its face, this does not appear to be a situation in which an adverse ruling

10  will impair or restrict the use of the property at issue—in fact, the suit does not concern

11  the members' refinery property at all, but rather nearby water bodies.  The only evidence

12  that Proposed Intervenors supply in support of their argument is a single sentence

13  asserting that:  "These regulatory consequences, and the associated economic impacts,

14  may also have significant adverse impacts to the value of the real properties owned by

15  API members and from which wastewater discharges occur."[3]  (Schild Dec. ¶ 6; *see also*

16  Holmes Dec. ¶ 8); *but see Barnum Timber Co. v. EPA*, 633 F.3d 894, 898 (9th Cir. 2011)

17  (finding that timber operator had standing to challenge a Section 303(d) listing because

18  forestry experts testified that the listing restricted timber operations and reduced property

19  value).  Absent even a minimal showing of a negative effect on real property, the court

20  ─────────────────

21      [3] Proposed Intervenors also cite to declarations stating that the refineries will incur increased
costs of compliance if their permits are modified.  (Mot. at 10).  These costs are subsumed in Proposed
Intervenors' arguments regarding the financial burden of more restrictive permits address previously in

22  Section III(A)(1)(a),(b).

1 finds Proposed Intervenors' cited authority inapposite, and rejects this argument as a

2 ground for finding a protectable interest.

3      Having reached the last of Proposed Intervenors' arguments, the court finds that

4 Proposed Intervenors fail to establish a significantly protectable interest in the substance

5 of this litigation.

6     **2.  Disposition of action may impair ability to protect interest**

7      Even if Proposed Intervenors had established a significantly protectable interest

8 predicated upon their NPDES permits, disposition of this case without the Proposed

9 Intervenors would not as a practical matter impair their ability to protect those interests.

10 *See Wilderness Soc.*, 630 F.3d at 1177.  In *Our Children's Earth Foundation v. EPA*, the

11 court denied intervention by regulated entities in a suit seeking to force EPA to review

12 Clean Air Act regulations.  *See* 2006 WL 1305223, at *3.  The applicants for intervention

13 were concerned about the development of more restrictive permits, but because the

14 "substantive content of any new regulations [was not] a subject of this lawsuit," the court

15 found that the applicants "may adequately protect their members' financial interests by

16 advocating for less stringent standards *during the EPA rule-making process itself*."  *Id.*

17 (emphasis in original).  So, too, here, the substantive content of Proposed Intervenors'

18 permits is not a subject of this lawsuit, and Proposed Intervenors can adequately protect

19 their members' interests during subsequent regulatory processes.

20      Specifically, in the event the matter is remanded to EPA for EPA to make a new

21 determination or to list impaired waters, any EPA proposal to list additional waters would

22 be subject to public notice and comment, a process in which Proposed Intervenors could

ORDER- 17

1   fully participate.  *See* 40 C.F.R. § 130.7(d)(2).  If additional waters were listed as

2   impaired, Proposed Intervenors could then also participate in the state's development of a

3   TMDL for those waters.  *See* 40 C.F.R. §130.7(c)(1)(ii) (requiring that calculations to

4   establish TMDLs shall be subject to public review consistent with the state's continuing

5   planning process); *see e.g.*, Or. Admin. R. § 540-042-0050 (establishing public notice and

6   comment during development of TMDLs).

7        Regarding the restrictions in NPDES permits, both Washington and Oregon

8   provide for public notice and comment prior to reissuance of permits.  *See, e.g.*, Wash.

9   Admin. Code § 173-220-050 (establishing public notice and 30-day written comment

10  period for individual NPDES permits), § 173-220-090 (establishing that applicants for

11  individual NPDES permits can request a public hearing), § 173-220-180 (establishing

12  that the notice and comment procedures are applicable to replacement of existing

13  individual permits), § 173-220-225 (establishing appeal process for individual NPDES

14  permits), § 173-226-130 (establishing public notice and written comment period for

15  general NPDES permits), § 463-76-041 (establishing public notice and comment  for

16  NPDES permits issued to energy facilities); Or. Admin. R. § 340-045-0027 (establishing

17  various amounts of public notice and participation regarding the issuance and renewal of

18  individual NPDES permits), § 340-045-0033(4) (establishing public notice and

19  participation procedures prior to issuing general permits).  Proposed Intervenors (or their

20  members) are free to argue their case for less restrictive permits at that time, as well.

21       In short, the third element of the Rule 24(a) test is not met because Proposed

22  Intervenors remain free to advance their members' economic and regulatory interests in

ORDER- 18

1   future administrative processes that more directly address those interests.  Because

2   Proposed Intervenors fail to show the second and third elements of the Rule 24(a) test,

3   the court DENIES Proposed Intervenors' motion for intervention as of right.

4   **B.    Permissive Intervention**

5          An applicant who seeks permissive intervention must prove that it meets three

6   threshold requirements:  (1) it shares a common question of law or fact with the main

7   action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction

8   over the applicant's claims.[4]  *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998);

9   Fed. R. Civ. P. 24(b).  Even where all the prerequisites are met, a district court has

10  considerable discretion to deny the motion.  *Donnelly*, 159 F.3d at 412.  "In exercising its

11  discretion, the court must consider whether the intervention will unduly delay or

12  prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3); *see*

13  *also Donnelly*, 159 F.3d at 412.  In addition, the court also should consider whether the

14  interests of the proposed intervenor are adequately represented in the proceedings

15  already.  *Venegas v. Skaggs*, 867 F.2d 527, 530 (9th Cir. 1989).  The court may also

16  consider whether the party seeking intervention will significantly contribute to the just

17  and equitable adjudication of the legal issues presented.  *See Spangler v. Pasadena Bd. of*

18  *Educ.*, 552 F.2d 1326, 1329 (citing *Hines v. Rapides Parish Sch. Bd.*, 479 F.2d 762, 765

19

20  _____

21      [4] "Where the proposed intervenor in a federal-question case brings no new claims, the
    jurisdictional concern drops away."  *Freedom from Religious Foundation, Inc. v. Geithner*, 644 F.3d 836,
22  844 (9th Cir. 2011).

ORDER- 19

1   (5th Cir. 1973)).  "Finally, judicial economy is a relevant consideration in deciding a

2   motion for permissive intervention."  *Id.* at 531.

3        Here, assuming that Proposed Intervenors establish the two applicable threshold

4   requirements for permissive intervention, practical considerations militate against

5   permissive intervention.  The court finds that Proposed Intervenors' interests are

6   adequately represented in this litigation without formal intervention.  Proposed

7   Intervenors  have not demonstrated that EPA is incapable or unwilling to make all

8   available arguments in support of their common objectives, or that the applicants will

9   contribute some element necessary to the adjudication of this case that would otherwise

10  be omitted.  *See Or. Envtl. Council*, 775 F. Supp. at 359.  To the extent that the Proposed

11  Intervenors seek to litigate the issue of whether EPA has complied with its duties under

12  the CWA, EPA is in a better position to raise arguments about its own compliance.  *See*

13  *Ctr. for Biological Diversity*, 2012 WL 909831, at *7.  Although the Proposed

14  Intervenors may have a unique point of view, intervention as a party will not necessarily

15  facilitate resolution on the merits, but is likely to result in duplicative briefing adding a

16  layer of unwarranted procedural complexity.  *See Drakes Bay Oyster Co. v. Salazar*, 12-

17  CV-06134-YGR, 2013 WL 451813, at *9 (N.D. Cal. Feb. 4, 2013).  For these reasons,

18  the court DENIES the Proposed Intervenors' motion for permissive intervention.

19  **C.    Amicus Status**

20       Although the Proposed Intervenors have not so moved, the court has "broad

21  discretion" to appoint amicus curiae.  *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th cir.

22  1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  Because

ORDER- 20

1 Proposed Intervenors have expressed a concerted interest in this litigation, and because

2 Proposed Intervenors believe that they have a unique perspective that may otherwise not

3 be represented in this litigation, the court grants Proposed Intervenors amicus curiae

4 status.

5        In the absence of local rules governing the role of amicus curiae, the court will

6 adhere to the applicable rules found in the Federal Rules of Appellate Procedure.

7 Accordingly, the Proposed Intervenors must file any memorandum commenting on a

8 party's memorandum no later than seven days after the party's principal brief is field.

9 *See* Fed. R. App. P. 29(e). Any amicus curiae brief filed by Proposed Intervenors will be

10 limited to no more than one-half the maximum length authorized by this court's local

11 rules for a party's principal brief. *See* Fed. R. App. P. 29(d); *see also* Local Rules W.D.

12 Wash. LCR 7(e). The Proposed Intervenors shall not file reply memoranda or participate

13 in oral argument unless authorized in advance by the court. *See* Fed. R. App. P. 29(f),

14 (g).

15 **IV. CONCLUSION**

16        For the foregoing reasons, the court DENIES the Proposed Intervenors' motion to

17 intervene (Dkt. # 14), but GRANTS the Proposed Intervenors amicus curiae status.

18        Dated this 18th day of February, 2014.

19

20 _____

21 JAMES L. ROBART
United States District Judge

22

ORDER- 21