1                              THE HONORABLE JAMES L. ROBART

2

3

4

5

6

7
                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON

8    CENTER FOR BIOLOGICAL              No. 2:13-cv-01866-JLR
     DIVERSITY,
9
                    Plaintiff,
10
         v.
11
     UNITED STATES ENVIRONMENTAL        ***AMICI CURIAE* BRIEF OF THE**
12   PROTECTION AGENCY; GINA            **WESTERN STATES PETROLEUM**
     McCARTHY, Administrator; DENNIS    **ASSOCIATION AND THE AMERICAN**
13   McLERRAN, Region 10 Administrator, **PETROLEUM INSTITUTE**
     United States Environmental Protection
14   Agency,
                                        NOTE ON MOTION CALENDAR:
15                  Defendants.         November 7, 2014

16

17

18

19

20

21

22

23

24

25

26

     *AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR)

1

# TABLE OF CONTENTS

2

PAGE

3   I.      INTRODUCTION ................................................................................ 1

4   II.     SUMMARY OF ADMINISTRATIVE RECORD ................................. 1

    III.    ARGUMENT ....................................................................................... 3

5           A.      Article III Standing Requirements ......................................... 3

6           B.      CBD's Alleged Injuries Are Not Causally Connected To EPA's Approval ........ 4

7                   1.      CBD's alleged injuries are attributable to the uptake of worldwide CO2 emissions by the Pacific Ocean over many decades ........................ 5

8                   2.      The alleged injuries are not and cannot be traced to local sources that could be regulated by EPA .............. 7

9           C.      CBD Does Not Show That A Favorable Decision Will Redress Its Alleged Injuries ................................ 12

10          D.      CBD's Alleged Informational Injuries Do Not Establish Standing .................... 13

11   IV.    CONCLUSION ................................................................................... 15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - i

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1

## TABLE OF AUTHORITIES

PAGE(S)

2

3

**Cases**

4

*Allen v. Wright*,
    468 U.S. 737 (1984)................................................................................4

5

6

*Barnes v. U.S. Dep't of Transp.*,
    655 F.3d 1124 (9th Cir. 2011) ..........................................................6

7

*Baxter v. Rodale, Inc.*,
    555 F. App'x 728 (9th Cir. 2014) ....................................................14

8

9

*Bensman v. U.S. Forest Serv.*,
    408 F.3d 945 (7th Cir. 2005) ...........................................................14

10

11

*Coal. for a Sustainable Delta v. Carlson*,
    No. 1:08-CV-00397, 2008 WL 2899725 (E.D. Cal. July 24, 2008).........................13

12

13

*Conservation Law Found., Inc. v. EPA*,
    964 F. Supp. 2d 175 (D. Mass. 2013) ..............................................8

14

*Dellums v. U.S. Nuclear Regulatory Comm'n*,
    863 F.2d 968 (D.C. Cir. 1988).........................................................4

15

16

*Federal Election Commission v. Akins*,
    524 U.S. 11, 23-25 (1998) ...............................................................13

17

18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..........................................................................3

19

*Fund Democracy, LLC v. SEC*,
    278 F.3d 21 (D.C. Cir. 2002) ..........................................................14

20

21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................. passim

22

*Maricopa-Stanfield Irr. & Drainage Dist. v. United States*,
    158 F.3d 428 (9th Cir. 1998) ...........................................................3

23

24

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ............................................6

25

26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - ii

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012) (Pro, J., concurring), *cert. denied*, 133 S. Ct.
    2390 (2013) ................................................................................................................4, 6

*Natural Res. Def. Council v. EPA*,
    542 F.3d 1235 (9th Cir. 2008) ...............................................................................12, 15

*Occidental Eng'g Co. v. INS*,
    753 F.2d 766 (9th Cir. 1985) .........................................................................................1

*Pollack v. U.S. Dep't of Justice*,
    577 F.3d 736 (7th Cir. 2009) ....................................................................................8, 10

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008) ................................................................................12, 15

*Sierra Club v. U.S. Def. Energy Support Ctr.*,
    No. 01:11-cv-41, 2011 WL 3321296 (E.D. Va. July 29, 2011) ......................................6

*State of Cal. Dep't of Soc. Servs. v. Thompson*,
    321 F.3d 835 (9th Cir. 2003) .........................................................................................8

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .........................................................................................................3

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .....................................................................................................14

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
    410 F.3d 964 (7th Cir. 2005) .........................................................................................8

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ............................................................................. passim

*Wilderness Soc'y, Inc. v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) ...........................................................................10, 13, 14

*Zivkovich v. Vatican Bank*,
    242 F. Supp. 2d 659 (N.D. Cal. 2002) ..........................................................................4

**Statutes**

Clean Water Act § 303(d) ....................................................................................... passim

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - iii

1

**Regulations**

2

40 C.F.R. § 130.7(d)(2)...........................................................................................................14

3

73 Fed. Reg. 44,354, 44,367 (July 30, 2008)............................................................................6

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - iv

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

# I.  INTRODUCTION

This litigation arises in the context of the ongoing national and international policy debate over the effects of global climate change attributed to anthropogenic emissions of greenhouse gases ("GHGs"), particularly carbon dioxide ($CO_2$).  In this instance, the national advocacy group Center for Biological Diversity ("CBD") seeks to shape federal policy regarding a purported secondary effect of global $CO_2$ emissions – ocean acidification – through the novel use of Section 303(d) of the Clean Water Act ("CWA").  However, CBD's efforts to compel climate change policy changes through this CWA litigation fail in the first instance because CBD lacks standing.  CBD has not met and cannot meet the causation and redressability requirements to establish Article III standing because the alleged injuries of its members are not traceable to the actions of the U.S. Environmental Protection Agency ("EPA") at issue in this litigation and would not be remedied by a favorable decision.[1]

# II.  SUMMARY OF ADMINISTRATIVE RECORD

The administrative record produced by EPA states that "the term *ocean acidification* refers to reductions in the pH of seawater caused by oceanic uptake of $CO_2$ from the atmosphere and by other chemical additions to or subtractions from the ocean."  WA-000712 (Feely et al. 2012 at 59).[2]  It is estimated that, over the past two-and-a-half centuries, the surface oceans

---

[1] Western States Petroleum Association ("WSPA") and American Petroleum Institute ("API") sought but were denied leave to intervene in this litigation; however, the Court granted WSPA and API leave to submit a brief as *amici curiae*.  Dkt. 22 at 20-21.  The interests of WSPA and API in this matter are addressed in detail in their submissions for intervention and in the Court's related order, and are not restated here.  *See id.*; Dkts. 14, 15, 17.  This *amici curiae* brief has not been authored or edited by counsel for a party; nor has a party or a party's counsel, or a person other than *amici*, contributed money to fund preparation and submittal of this brief.  *Amici* also join in the arguments of EPA addressed to the merits of CBD's claims.

[2] This section briefly summarizes portions of the administrative record produced by EPA, as relevant to the issues addressed in this brief.  *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (in an Administrative Procedure Act case, the facts are established by the agency's administrative record).  Feely et al. 2012 refers to the final report of the National Oceanic and Atmospheric Administration's Scientific Summary of Ocean Acidification for the Washington Shellfish Initiative Blue Ribbon Panel.  *See* WA-000712.

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 1

1    "have absorbed more than 550 billion tons of carbon dioxide from the atmosphere, or

2    approximately 30% of the total anthropogenic carbon dioxide emissions" worldwide.  OR2-

3    002161 (Feely et al. 2010).  The oceanic uptake of atmospheric $CO_2$ produced by global

4    emissions is asserted to be "indisputably the most important driver of ocean acidification in the

5    open-ocean waters of the North Pacific."  WA-000712 (Feely et al. 2012 at 15).[3]

6           Both natural (*e.g.,* upwelling of deep ocean water, freshwater (river) inputs) and

7    anthropogenic (*e.g.,* local emissions and wastewater discharges) local factors are also recognized

8    as <u>potential</u> contributors to regional acidification.[4]  However, it is unknown and, currently

9    unknowable, how, where, whether, when, and to what extent these factors contribute to ocean

10   acidification.  *See, e.g.,* WA-000712 (Feely et al. 2012 at 36) ("Whether [local $CO_2$ emissions

11   from the Puget Sound region] has resulted in a measurable decrease in the pH of local surface

12   waters is not known."); *id.* at 33 ("[I]t is not possible to *directly* determine the level to which

13   human activity in this [Puget Sound] region is contributing to acidification." (emphasis in

14   original)); *id.* at 37 ("The significance of [emissions of nitrogen oxides and sulfur oxides in the

15   Puget Sound region] for ocean acidification in the Puget Sound region is . . . not known."); *id.*

16   ("The contribution of wastewater discharges to ocean acidification conditions is not known[.]");

17   *id.* at 35 ("What is *not* known is the magnitude of the effect that the anthropogenic nitrogen

18   inputs have on pH or aragonite saturation levels." (emphasis in original)).

19   ───────────────

        [3] Although global $CO_2$ emissions are identified in the administrative record as the
20   primary driver of ocean acidification, whether, how, and when any such acidification can be
     reliably associated with identifiable impacts, such as the alleged injuries of CBD's members,
21   remains unknown and uncertain.

        [4] Upwelling has been identified as the primary local factor influencing ocean acidification
22   in western North America.  OR2-002162 (Feely et al. 2010) ("The coastal region off western
     North America is strongly influenced by seasonal upwelling … [the] acidified, oxygen-depleted
23   waters have the potential for entering Puget Sound via the Juan de Fuca submarine canyon in the
     summer and fall months.").  According to the record, the source water for upwelling on the
24   North American Pacific coast carries anthropogenic $CO_2$ deposited from global emissions and
     "takes on the order of decades to transit from the point of subduction to the upwelling locales
25   (Feely et al. 2008)."

26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 2

### III.  ARGUMENT

1
2      At issue is EPA's approval of the CWA § 303(d) "impaired waters" lists proposed by the
3      states of Washington and Oregon ("EPA's Approval").  As demonstrated below, CBD has not
4      established that any of its individual members have standing to bring the claims CBD has
5      asserted in this litigation.  Although CBD's members state generalized concerns about what they
6      believe to be the possible effects of ocean acidification, they do not assert the "specific facts"
7      required to establish the core elements of Article III standing.  Nowhere in the declarations
8      submitted by CBD are specific facts demonstrating that any member has experienced an injury
9      that is caused by EPA's Approval and would be redressed by the relief CBD seeks.

10  **A.      Article III Standing Requirements**

11      Every plaintiff must establish Article III standing before proceeding to the merits of its
12  case.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *Maricopa-Stanfield Irr.*
13  *& Drainage Dist. v. United States*, 158 F.3d 428, 433 (9th Cir. 1998) (addressing threshold
14  standing issue raised by *amici*).  To demonstrate standing, an organizational plaintiff has the
15  burden to prove that at least one of its members (i) has suffered a concrete, particularized, and
16  imminent injury; (ii) that is fairly traceable to the actions of the defendant; and (iii) likely to be
17  redressed by a favorable court decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61
18  (1992); *Steel Co.*, 523 U.S. at 103-04 ("This triad of injury in fact, causation, and redressability
19  constitutes the core of Article III's case-or-controversy requirement, and the party invoking
20  federal jurisdiction bears the burden of establishing its existence." (footnote omitted)).[5]  These
21  elements must be met "for each claim . . . and for each form of relief sought."  *Wash. Envtl.*

22
23      [5] Organizations have standing if their "members would otherwise have standing to sue in
their own right, the interests at stake are germane to the organization's purpose, and neither the
claim asserted nor the relief requested requires the participation of individual members in the
24  lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181
(2000).  Assuming that the environmental interests at stake in this case are germane to CBD's
25  purpose, the issue presented is whether CBD's members would have standing to sue
individually.
26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 3

1   *Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).  At the summary judgment stage, a party

2   must "'set forth' by affidavit or other evidence 'specific facts'" to establish these elements.

3   *Lujan*, 504 U.S. at 561 (citation omitted).

4   **B.    CBD's Alleged Injuries Are Not Causally Connected To EPA's Approval**

5          A plaintiff must demonstrate that it has experienced an injury that is fairly traceable to

6   the defendant's conduct and not the result of independent causes.  *Id.* at 562; *Bellon*, 732 F.3d at

7   1146 ("[C]ausality examines the connection between the alleged misconduct and injury . . . .");

8   *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 980 (D.C. Cir. 1988) ("[T]he

9   complainant has the burden of showing that but for the particular governmental action that he is

10  challenging, the injury would abate.").  For a plaintiff to have standing, "[t]he line of causation

11  between the defendant's action and the plaintiff's harm must be more than attenuated" and the

12  links in the line of causation cannot be "hypothetical or tenuous."  *Bellon*, 732 F.3d at 1141-42

13  (quoting *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012) (Pro, J.,

14  concurring) (internal quotation marks and citations omitted), *cert. denied*, 133 S. Ct. 2390

15  (2013)); *see also id.* at 1142 ("Under *Lujan*'s causality prong, Plaintiffs must show that a causal

16  connection exists between their asserted injuries and the conduct complained of – *i.e.*, the

17  Agencies' failure to set and apply RACT standards."); *Zivkovich v. Vatican Bank*, 242 F. Supp.

18  2d 659, 670 (N.D. Cal. 2002) (causation requirement "demands Plaintiff show each link in the

19  causal chain between the defendant and the asserted injury" (citing *Allen v. Wright*, 468 U.S.

20  737, 759 (1984))).

21         CBD has not demonstrated that its members' alleged injuries are caused by EPA's

22  Approval.  First, the administrative record associates ocean acidification with global $CO_2$

23  emissions by countless third parties across the globe over the past several decades that have

24  occurred, and will occur, regardless of EPA's Approval.  Second, the record also establishes that

25  whether, where, when, how, and to what extent other factors may contribute to ocean

26  acidification are uncertain and unknown.  The declarations submitted by CBD's members make

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 4

1   no showing, nor can they, that their alleged injuries are caused by the contributions of other

2   factors to ocean acidification.

3         **1.   CBD's alleged injuries are attributable to the uptake of worldwide $CO_2$ emissions by the Pacific Ocean over many decades**

4

5         According to the administrative record, the oceanic uptake of atmospheric $CO_2$ from

6   global sources is "the most important driver of ocean acidification in the open-ocean waters of

7   the North Pacific."  WA-000712 (Feely et al. 2012 at 15); *see id.* at 21 ("The human contribution

8   to acidification on Washington's outer coast is almost entirely due to atmospheric $CO_2$ from

9   global sources.").  Moreover, as explained in the Blue Ribbon Panel's Scientific Summary,

10  acidification that is observed in the oceans today, and that may be observed in the foreseeable

11  future, is the result of uptake of $CO_2$ that was emitted decades, if not centuries, ago.  *See id.* at 4-

12  6.[6]  EPA's Approval has no bearing on how the processes of oceanic $CO_2$ uptake and

13  acidification will or will not affect CBD's members presently or in the foreseeable future.  In this

14  respect, the Ninth Circuit's recent decision in *Bellon* is instructive.

15        In *Bellon,* the plaintiffs filed a lawsuit to compel state agencies to regulate the $CO_2$

16  emissions of five refineries in Washington State.  The plaintiffs maintained that they had

17  suffered injuries resulting from the local effects of climate change (such as reduced recreational

18  opportunities due to decreased snow cover) and that the state agencies caused these injuries by

19  failing to regulate the $CO_2$ emissions of the five refineries.  *Bellon*, 732 F.3d 1131.  A unanimous

20  Ninth Circuit panel held that the plaintiffs lacked standing to bring their claims.[7]  The court

21  _____

22      [6] Feely et al. 2012 found that ocean acidification in Washington State depends in part on
    unpredictable wind patterns that result in upwelling of global atmospheric $CO_2$ deposited

23  between 30 and 50 years ago.  WA-000712 (Feely et al. 2012 at 11) ("Water that is upwelling
    onto the coast of Washington and Oregon now contains approximately ~31 μmol kg-1

24  anthropogenic $CO_2$ and has been out of contact with the atmosphere for approximately 30–50
    years.").

25      [7] In *Bellon*, as here, the defendant regulatory agencies declined to pursue standing,

26  leaving the issue to be raised by the regulated community and decided by the court.

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 5

1    determined that the chain of causation was too attenuated because of the "natural disjunction

2    between Plaintiffs' localized injuries and the greenhouse effect" as local emissions "quickly mix

3    and disperse in the global atmosphere" with global emissions before causing the alleged climate

4    change effects.  *Id.* at 1143.  In addition, the court found that the plaintiffs had failed to establish

5    causation due to the "multitude of independent third parties," both in and outside the United

6    States, emitting $CO_2$ that caused the alleged injuries.  *Id.* at 1144.  In short, the plaintiffs could

7    not demonstrate that their claimed injuries were fairly traceable to the failure to regulate $CO_2$

8    emissions from the five refineries "because the record show[ed] no evidentiary support

9    establishing this causal nexus."  *Id.*

10        Similar to the *Bellon* plaintiffs, CBD's members here assert that they have suffered

11    recreational injuries that they attribute to ocean acidification.  *See* Dkt. 33 (CBD Br.) at 10-11;

12    *see generally* Dkts. 33-2 (Antoine Decl.), 33-3 (Weitzer Decl.), 33-4 (Moritz Decl.), 33-5

13    (Easton Decl).  Also like the *Bellon* plaintiffs, CBD's members have failed to provide

14    evidentiary support showing that EPA's Approval – not worldwide $CO_2$ emissions – is the cause

15    of their alleged injuries.  Nor has CBD provided any explanation or basis for how EPA can

16    regulate global sources of $CO_2$ emissions through CWA § 303(d) (because it cannot).  Because

17    CBD's claimed injuries "'involve[] numerous third parties whose independent decisions

18    collectively have a significant effect on plaintiffs' injuries, ... the causal chain [is] too weak to

19    support standing.'"  *Bellon*, 732 F.3d at 1142 (quoting *Native Vill. of Kivalina*, 696 F.3d at 867).[8]

20

21    [8] *See also Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D.
     Cal. 2009) ("[T]here is no realistic possibility of tracing any particular alleged effect of global
     warming to any particular emissions by any specific person, entity, group at any particular point

22    in time."); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (a project
     accounting for 0.03% of U.S. GHG emissions does not result in discernible local impacts

23    because such emissions do "not translate into locally-quantifiable environmental impacts given
     the global nature of climate change"); *Sierra Club v. U.S. Def. Energy Support Ctr.*, No. 01:11-

24    cv-41, 2011 WL 3321296, at *4 (E.D. Va. July 29, 2011) (plaintiffs could not establish causation
     because a "reduction of greenhouse gas emissions in one area or from one source has no effect

25    on greenhouse gas levels that are specific to that area"); 73 Fed. Reg. 44,354, 44,367 (July 30,
     2008) (Advance Notice of Proposed Rulemaking regarding interpretation of *Massachusetts v.*

26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 6

1      **2.**     **The alleged injuries are not and cannot be traced to local sources that could**
           **be regulated by EPA**

2

3      CBD contends in its summary judgment brief that "[l]ocal sources of pollution have a

4 large impact on pH in many of the coastal areas in Oregon and Washington, and implementing

5 local pollution control would reduce acidification, ameliorating the harm Center members are

6 suffering." CBD Br. at 10. As set forth below, CBD's generic assertions of standing based on

7 purported local sources of pollution are not supported by the record and, in any event, are

8 insufficient to establish causation.

9      Although various anthropogenic and natural sources have been identified as factors that

10 may contribute to ocean acidification, the record demonstrates that how, whether, when, where,

11 and to what extent local factors in Washington and Oregon influence ocean acidification are

12 unknown and uncertain. *See* § II *supra*. Indeed, none of the declarations submitted by CBD's

13 members present "specific facts" demonstrating that they have been injured as a result of local

14 sources of pollution. For example, although CBD argues that local pollution impacts "many of

15 the coastal areas in Oregon and Washington," it fails to identify any of the specific areas

16 allegedly impacted. CBD Br. at 10. CBD also argues that stormwater and erosion "directly

17 exacerbate coastal ocean acidification in the Pacific Northwest," but does not identify which

18 coastal waters are exacerbated by such runoff or whether such waters are used by its members.

19 *Id.*[9] These vague and conclusory allegations are not sufficient to establish the "specific facts"

20

21 *EPA*) (there is "little or nothing that a single state or region can do that will appreciably alter the
atmospheric GHG concentration level in that particular State or region"; "local and regional

22 public health and welfare" cannot "be improved by reducing local and regional emissions").

23      [9] The Moritz Declaration states that "*Feely et al.*, found that about 50 percent of
acidification in the Puget Sound's Hood Canal is the result of anthropogenic runoff." Dkt. 33-4

24 ¶ 14. However, Ms. Moritz's incorrect statement appears to result from a misinterpretation of
Feely et al. 2010, which simply cites to a study (Doney et al. 2007) that did <u>not</u> involve Puget

25 Sound for the proposition that local sources in general "<u>can</u> further reduce the pH by <u>as much as</u>
an additional 50%." OR2-002165 (Feely et al. 2010 at 446) (emphases added) (citing OR2-

26 001982 (Doney et al. 2007)). Feely et al. 2010 points out that the data concerning local

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 7

1    necessary to support causation.  *See Bellon*, 732 F.3d at 1142; *see also, e.g., Tex. Indep.*

2    *Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 972 (7th Cir. 2005) (citizens failed to

3    establish causation and thus lacked standing to challenge EPA stormwater general permit

4    because affidavit's "conclusory statement does not identify any specific construction sites

5    authorized under the General Permit and fails to present evidence of any discharges into the

6    water bodies at issue"); *Conservation Law Found., Inc. v. EPA*, 964 F. Supp. 2d 175, 191 (D.

7    Mass. 2013) (plaintiffs lacked standing to challenge EPA's approval of TMDLs in part because

8    supporting affidavits' conclusions on effects of discharges were "speculative and

9    inadmissible").[10]

10       CBD's other allegations concerning local pollution establish only that acidification may

11   be caused by local sources, but identify no causal connection between any local sources and the

12   alleged injuries of CBD's members.  Specifically, CBD argues that "human activities <u>can</u>

13   significantly lower the pH of nearby waters, creating acidification hot spots" and that "[i]n some

---

15   acidification are not from the Pacific Northwest but from "regions with more significant
     anthropogenic nutrient loading, such as Chesapeake Bay and the Belgian coastal zone."  OR2-

16   002166; *accord* OR2-002892 (Kelly et al. 2011 at 1036).  In fact, Feely et al. do not assign any
     percentage of acidity to local anthropogenic sources and, instead, calculate that between 24%

17   and 49% of the dissolved inorganic carbon in Hood Canal is from "oceanic contribution"
     (*i.e.*, an influx of coastal waters bearing dissolved inorganic carbon).  OR2-002166 (Feely et al.

18   2010 at 442, 447-48); WA-000712 (Feely et al. 2012 at 32).  The other 51% to 76% of
     acidification in Feely et al.'s calculation is attributed to natural respiration processes (*i.e.,* when

19   plankton die and microbial degradation of the plankton releases carbon dioxide into the

20   water).  OR2-002166 (Feely et al. 2010 at 443, 447-48).  Finally, even if the pH of Hood Canal
     was significantly affected by local anthropogenic sources, CBD has not established standing

21   because none of its declarants (including Ms. Moritz) assert that they visit and use Hood Canal.

22       [10] The vagueness with which CBD alleges injury further indicates that its harm amounts
     to a generalized grievance that will not support standing.  *See Pollack v. U.S. Dep't of Justice*,

23   577 F.3d 736, 743 (7th Cir. 2009) (determining that plaintiffs' "generalized statements . . . do not
     give rise to standing"); *see also* Dkt. 22 at 12 (Order on Motion to Intervene) ("[A]n

24   undifferentiated, generalized interest in the outcome of an ongoing action is too porous a
     foundation on which to premise intervention as of right." (internal quotation marks and citation

25   omitted)); *State of Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 846 n.9 (9th Cir. 2003)

26   (standard for Article III standing is more stringent than standard for intervention).

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 8

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    coastal areas, local sources of air pollution <u>can</u> contribute as much as ten to fifty percent of the

2    $CO_2$-derived acidification."  CBD Br. at 11 (emphases added) (citing Kelly et al. 2010; Feely et

3    al. 2012).  However, the fact that local sources theoretically can cause local acidification does

4    not establish that local sources have caused or are likely to cause injuries to CBD's members in

5    the waters they use.  Moreover, contrary to CBD's argument, researchers have yet "to determine

6    if there is a causal relationship between local air emissions and local marine water acidity."

7    WA-000712 (Ruckelshaus et al. 2012 at 28, 51).

8              Nor does the record support CBD's conclusory allegations that its injuries result from

9    local acidification.  Neither of the studies relied upon by CBD (*i.e.*, Feely et al. 2012 and Kelly et

10   al. 2011) concludes that in-state air emissions or runoff has meaningfully contributed to

11   acidification in any water body in Washington or Oregon.  Kelly et al. 2011 addresses local

12   acidification hot spots in the Gulf of Maine, Chesapeake Bay, and the Manning River estuary in

13   Australia, and does not discuss Washington or Oregon coastal waters at all.  OR2-002892.  Feely

14   et al. 2012 simply acknowledges the possibility that local sources may contribute to ocean

15   acidification based on a study that does not discuss Pacific Northwest waters.  *See* WA-000712

16   (Feely et al. 2012) (citing OR2-001982 (Doney et al. 2007)).  With regard to the Pacific

17   Northwest coast and Puget Sound, however, Feely et al. consistently and repeatedly conclude

18   that the existence and degree of local acidification is unknown:

19
20   • "What is *not* known is the magnitude of the effect that the anthropogenic nitrogen inputs
       have on pH or aragonite saturation levels."  *Id*. at 35 (emphasis in original).

21   • "The significance of these acid gases [NOx and SOx] for ocean acidification in the Puget
22     Sound region … is not known."  *Id*. at 37.

     • "Whether this local enhancement [of $CO_2$ in areas near Puget Sound] has resulted in a
23     measurable decrease in the pH of local surface waters is not known."  *Id*. at 36.

24   • "The contribution of wastewater discharges to ocean acidification conditions [in Puget
25     Sound] is not known[.]"  *Id*. at 37.

26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 9

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1    • "The effect from existing pulp mills on water quality in Puget Sound is not known[.]"  *Id.*
2        at 36.

3    For other Washington and Oregon coastal waters beyond Puget Sound, Feely et al. reach similar

4    conclusions that the existence and degree of local acidification are unknown.  *See, e.g., id.* at 49-

5    50 (in contrast to European estimates of high local acidification, "[s]imilar measurements of

6    carbon dioxide concentrations in Washington's estuaries [such as Willapa Bay] are not

7    available").

8        Not only do the declarations of CBD's members fail to show that their alleged injuries

9    are caused by local sources of pollution, they also altogether fail to identify any specific local

10   sources of acidity in the waters they use.  *See Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 742

11   (7th Cir. 2009) ("*Lujan* makes clear that when a vast environmental area is involved and the

12   pollution affects one discrete area while a plaintiff intends to visit a different discrete area, that

13   plaintiff does not have standing."); *see also Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1257

14   (9th Cir. 2010) (no standing because "no indication that the Ash Creek Project would affect the

15   particular area of the Umpqua Forest that Anderson plans to use in the future").  Although CBD

16   asserts that after a § 303(d) listing, "programs under the Clean Water Act will reduce these local

17   pollution inputs," such as runoff and stormwater surges, it does not identify any actual

18   stormwater or runoff inputs causing acidity in the waters used by its members.  CBD Br. at 11.

19   In addition, the Moritz Declaration expresses generalized concern about pollution from

20   concentrated animal feeding operations ("CAFOs"), but it, too, fails to identify any specific

21   CAFOs or other local sources in the areas used by Ms. Moritz.  *See* Dkt. 33-4 ¶¶ 14, 19, 20.[11]

22   _____

23   [11] Ms. Moritz also asserts that if EPA had disapproved Washington and Oregon's
     impaired waters lists, "EPA and the states would have established and implemented pollution
24   limits, reducing acidifying contributions to the marine waters I enjoy and redressing the ongoing
     harm to my interests."  *Id.* at ¶ 19.  However, this conclusory statement lacks any "specific facts"
25   demonstrating "the connection between the alleged misconduct and injury."  *Bellon*, 732 F.3d at
     1146.  Moreover, Ms. Moritz does not identify any waters that she uses that have been acidified
26   by local sources that could be regulated by EPA or the states.  *See also infra* § III.C.

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 10

1    Finally, another CBD member asserts that "[o]cean acidification affects [his] enjoyment

2  of shellfish harvesting because there are now fewer oysters and clams available to harvest" and

3  that "the food web may suffer as a result of ocean acidification."  Dkt. 33-3 ¶¶ 9, 14 (Weitzer

4  Decl.).  However, again, these alleged injuries are not connected to any causal element, nor can

5  they be so connected:

6  • "At this time, we have insufficient information to determine the response of marine food
     webs in Washington State to acidification."  WA-000712 (Feely et al. 2012 at 89).
7

8  • "Little is known about the response of individual marine microbial taxa to increasing
     $pCO_2$."  *Id.* at 63.
9

10  • The potential impacts of ocean acidification on other zooplankton species "are virtually
      unknown."  *Id.* at 69.

11  • Research is needed to "[e]lucidate *direct effects* of ocean acidification on species of
12    concern, including shellfish" as well as the indirect effects.  *Id.* at 80 (emphasis in
      original).

13
    • "The direct impacts of acidification on salmon species remain uncertain, especially
14    because these species spend their early life stages in fresh waters of relatively low pH."
      *Id.* at 79.
15

16  • "The underlying causes of low levels of Pacific oyster recruitment in Willapa Bay have
      not been determined."  *Id.* at 70.[12]

17  _____

18    [12] With respect to shellfish, "[o]bservations of high mortality among larval stages of
    oysters in the Pacific Northwest have raised concern that changing water chemistry due to ocean
19  acidification could be causing the negative effects observed in shellfish populations."  WA-
    000712 (Feely et al. 2012 at 42).  To investigate this concern, studies have been carried out in
20  Totten Inlet in South Puget Sound, in Dabob Bay near the north end of Hood Canal, and in
    Netarts Bay, Oregon.  None of these studies yielded conclusive results, but they did demonstrate
21  some associations with two factors – upwelling and biological respiration.  In the Puget Sound
    studies, it was found that "[t]he major factor influencing water chemistry in Dabob Bay is wind-
22  driven localized upwelling, whereas in Totten Inlet, nearshore carbonate chemistry appears to be
    dominated by biological respiration [a natural process]."  *Id.* at 42.  Similarly, in the Netarts Bay
23  study, it was found that carbonate chemistry in the bay is influenced by "the upwelling state of
    the adjacent coastal ocean."  OR2-001526 (Barton et al. 2012); OR2-007615 (Barton et al. 2008)
24  ("upwelling of nutrient rich deep ocean water onto the continental shelf results in sharp decline
    in the performance of bivalve larvae").  The study also found that "the bay itself experiences
25  large fluctuations in carbonate chemistry driven by primarily natural mechanisms."  OR2-001530
    (Barton et al. 2012); *see also* OR2-002237 (Feely et al. 2008) ("much of the corrosive character
26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 11

1    In sum, the declarations submitted by CBD's members fail to establish that their alleged injuries

2    are traceable to any sources that could be regulated under CWA § 303(d).[13]

3    **C.    CBD Does Not Show That A Favorable Decision Will Redress Its Alleged Injuries**

4            CBD must demonstrate that it is "likely," not "speculative," that a favorable decision will

5    redress its members' alleged injuries.  *Lujan*, 504 U.S. at 561 (internal quotation marks and

6    citation omitted).  The redressability element is not satisfied where, as here, the plaintiffs'

7    injuries are "likely to continue unabated" despite a favorable court decision.  *Bellon*, 732 F.3d at

8    1147; *see Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir.

9    2008) (plaintiffs lacked standing because "if we rule in their favor, they will still suffer injury").

10           CBD cannot establish that a court order vacating EPA's Approval would redress its

11    alleged harm because its members assert injuries attributable to a global process that occurs due

12    to worldwide $CO_2$ emissions beyond the reach of state and federal regulation.  *See* WA-000712

13    (Ruckelshaus et al. 2012 at 35, 36) ("to counter . . . ocean acidification, global emissions of

14    carbon dioxide must be . . . reduced" and "Washington cannot accomplish global emission

15    reductions alone"); *accord* WA-000712 (Feely et al. 2012 at 4); *see also* § III.B.1 *supra*.[14]  In

16    addition, for the reasons stated in § III.B.2 *supra*, CBD's generalized allegations of local sources

17

---

18    of these waters is the natural result of respiration processes" (emphasis added)); *see also* Dkt. 34

19    at 17-18, 20-22 (EPA Br.).  None of these findings identify even a potential cause of

20    acidification that can be regulated under CWA § 303(d).

21         [13] The causal connection between CBD's alleged harm and EPA's Approval is thus more

speculative than in *Bellon* where plaintiffs could at least identify the alleged source of their

22    asserted injuries, namely, five refineries in Washington State.  732 F.3d at 1135; *see also Natural

Res. Def. Council v. EPA*, 542 F.3d 1235, 1245 (9th Cir. 2008) (determining standing was

23    present when "declarations describe . . . observed storm water discharge flowing directly from

construction sites into the waterways the members use" (emphasis added)).

24         [14] CBD admits that ocean pH will continue to increase so long as global $CO_2$ emissions

continue to increase.  *See* WA-000926 (CBD Letter to State of Oregon) ("Ocean pH has

25    decreased by 0.11 units since the industrial age and will continue to decrease at an accelerated

26    rate if carbon dioxide emissions continue to increase as predicted[.]").

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 12

1    of acidification fail to establish redressability because CBD does not show that the waters its

2    members claim to use are subject to anthropogenic sources of acidification that could be

3    addressed through the CWA § 303(d) process.  Moreover, CBD has presented no evidence

4    demonstrating that regulation of theoretical local anthropogenic sources of acidification would

5    redress its members' alleged injuries in light of overriding global and natural sources of

6    acidification.[15]  In sum, whether a court order vacating EPA's Approval will redress the alleged

7    injuries of CBD's members is, at best, speculative.  CBD has not established the redressability

8    element.

9    **D.     CBD's Alleged Informational Injuries Do Not Establish Standing**

10           CBD's members assert that they are injured because they allegedly will not receive

11   certain information about ocean acidification as a result of EPA's Approval and will not be able

12   to participate in future notice and comment processes.  In support of these alleged informational

13   injuries, CBD cites *Federal Election Comm'n v. Akins*, in which the U.S. Supreme Court

14   determined that the plaintiffs had standing based on a right to disclosure of information about

15   campaign activities under the Federal Election Campaign Act.  524 U.S. 11, 23-25 (1998).

16   However, as the Ninth Circuit has made clear, *Akins* applies only in the narrow circumstance in

17   which the purpose of the statute at issue is to disclose information and, particularly, when it is

18   "'directly related to voting, the most basic of political rights.'"  *Rey*, 622 F.3d at 1258 (quoting

19   *Akins*, 524 U.S. at 24-25).  In contrast, in *Rey*, the Ninth Circuit rejected an alleged informational

20   injury as a basis for standing because the purpose of the statute at issue was "not to disclose

21           [15] *See, e.g.*, *Coal. for a Sustainable Delta v. Carlson*, No. 1:08-CV-00397, 2008 WL
22   2899725, at *10 (E.D. Cal. July 24, 2008) ("Here, the Coalition lacks standing to sue [under the
     ESA] because, even if it were to prevail in this case, its injury would not necessarily be
23   redressed.  If the regulations were invalidated, even if the striped bass population were reduced
     to a level that measurably protected salmonid species on which they prey, there are … other
24   causes: operation of the Projects, toxics, in-Delta diverters, alien invasive species, all of which
     contribute to the species' jeopardy….  The extent to which all other cooperative causes will
25   continue to operate is unknown.  There remains total uncertainty whether reduction in the threat
     of some predators will have more than minimal effect on the protected species.").
26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 13

1    information, but rather to allow the public opportunity to comment on the proposals."  *Id.* at

2    1259; *see also Baxter v. Rodale, Inc.*, 555 F. App'x 728, 730 & n.1 (9th Cir. 2014)

3    (informational injury applies only when "primary purpose" of statute at issue is to provide

4    information).

5         As applied here, CWA § 303(d) does not provide any right to information regarding

6    impaired waters.  Although CBD cites regulations requiring notice and comment, similar notice

7    and comment requirements were insufficient to establish an informational injury in *Rey*.  Also

8    like the statute at issue in *Rey*, the § 303(d) regulations contain informational requirements that

9    are incidental to other goals, namely, the establishment of impaired waters lists and TMDLs.  *See*

10   *Rey*, 622 F.3d at 1259; 40 C.F.R. § 130.7(d)(2).[16]  Similarly, the claimed desire of CBD's

11   members to participate in future proceedings does not establish injury for standing purposes, and

12   CBD cites no legal authority for this proposition.  *See* CBD Br. at 11.  "Participation in agency

13   proceedings is alone insufficient to satisfy judicial standing requirements."[17]  *Fund Democracy,*

14   *LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002); *see Summers v. Earth Island Inst.*, 555 U.S. 488,

15   496 (2009) (filing comments was not a sufficient interest to support standing); *Bensman v. U.S.*

16   *Forest Serv.*, 408 F.3d 945, 955 (7th Cir. 2005) ("A claimed participation injury cannot alone

17

18

19

20   [16] The notice and comment requirements appear in the last sentence of a paragraph
     otherwise establishing substantive duties for the Administrator in approving impaired waters lists
21   and TMDLs.

22       [17] In any event, CBD and its members have already had ample opportunity to comment
     and participate on the issues presented in this litigation.  The record contains at least 23 letters
23   and emails from CBD to EPA and state administrators regarding the Oregon and Washington
     303(d) process and responding to EPA's national call for comments on 303(d) and ocean
24   acidification.  *See* OR1-000478; OR1-000309; OR2-000829; OR2-004495; OR2-004539; OR2-
     004544; OR2-004549; OR2-004555; OR2-004567; OR2-004575; OR2-004601; OR2-004622;
25   OR2-004645; OR2-004683; WA-000916; WA-000936; WA-000956; WA-000959; WA-000969;
     WA-000977; WA-000980; WA-000992; WA-001005.
26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 14

1  serve as proxy for the constitutionally required showing of concrete and particularized harm.").[18]

2  In sum, under well-established authorities, CBD's claimed informational injuries are not

3  sufficient to create Article III standing.

4  ### IV.  CONCLUSION

5        CBD does not and cannot establish the Article III standing elements to create jurisdiction

6  for this Court to hear its claims.  Accordingly, WSPA and API respectfully request this Court to

7  dismiss CBD's claims for lack of jurisdiction.

8        DATED:  August 29, 2014.

STOEL RIVES LLP

10  */s/ Ryan P. Steen*
   Ryan P. Steen, WSBA No. 39922

11  Jeffrey W. Leppo, WSBA No. 11099
   Daniel K. Lee, WSBA No. 46796

12  rpsteen@stoel.com
   jwleppo@stoel.com

13  dklee@stoel.com

14  600 University Street, Suite 3600
   Seattle, WA  98101

15  Telephone:  (206) 624-0900
   Facsimile:  (206) 386-7500

16  Attorneys for Western States Petroleum
   Association and American Petroleum Institute

---

19  [18] CBD also suggests in a parenthetical notation that "procedural standing may be shown
if plaintiff demonstrates the procedures in question are designed to protect some threatened
concrete interest."  CBD Br. at 11 (citing *Lujan*, 504 U.S. at 572-73).  However, the mere fact
that CBD seeks to compel EPA, pursuant to the general judicial review provisions of the
Administrative Procedure Act, to disapprove the Washington and Oregon impaired waters lists
does not of its own establish a procedural right for standing purposes.  *See Bellon*, 732 F.3d at
1144-45 (no procedural right for standing when plaintiffs filed citizen suit to compel agency
action).  Moreover, as clarified by the Ninth Circuit in *Bellon*, even if a procedural right is
asserted, a causal connection is not inferred simply because a plaintiff seeks to enforce a
regulatory obligation – "the critical inquiry for standing purposes is whether the Agencies'
alleged misconduct causes injury to *Plaintiffs*."  *Id.* at 1144 (underlining added; italics in
original) (citing *Natural Res. Def. Council*, 542 F.3d at 1245); *see Gutierrez*, 545 F.3d at 1227
("[T]he redressibility requirement is not toothless in procedural injury cases.").

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 15

76874583.4 0078439-00012

1

## <u>CERTIFICATE OF SERVICE</u>

2
3
4
5
6

I hereby certify that on August 29, 2014, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court – Western District of Washington by using the CM/ECF system.  Participants in this Case No. 2:13-cv-01866-JLR who are registered CM/ECF users will be served by the CM/ECF system.

7
8
9

*/s/ Ryan P. Steen*
Ryan P. Steen

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*AMICI CURIAE* BRIEF OF WSPA AND API (2:13-cv-01866-JLR) - 16

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*