THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

9    UNITED STATES DISTRICT COURT FOR THE
     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10

11

12   CENTER FOR BIOLOGICAL DIVERSITY,          CASE NO. 2:13-cv-01866-JLR

13        Plaintiff,

14        v.                                    BRIEF OF *AMICI CURIAE* PACIFIC COAST
                                                FEDERATION OF FISHERMEN'S
15   UNITED STATES ENVIRONMENTAL                ASSOCIATIONS, SOUTHERN CALIFORNIA
     PROTECTION AGENCY, ET AL.                  TRAWLERS' ASSOCIATION, AND
16                                              INSTITUTE FOR FISHERIES RESOURCES
                                                IN SUPPORT OF PLAINTIFF CENTER FOR
17        Defendants.                           BIOLOGICAL DIVERSITY'S MOTION FOR
                                                SUMMARY JUDGMENT
18

19

20                                             NOTE ON MOTION CALENDAR:
                                               November 7, 2014
21

22

23

24

25

26

27

28

BRIEF OF *AMICUS* PCFFA                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                        357 E. Chicago Ave.
(2:13-cv-01866-JLR)                             Chicago, IL 60611
                                                (312) 503-7983

i

**TABLE OF CONTENTS**

**INTRODUCTION** ...........................................................................................................1

**STATEMENT OF INTEREST** ....................................................................................1

**SUMMARY OF ARGUMENT** ....................................................................................2

**ARGUMENT** ................................................................................................................3

   **I.**   **EPA Must Disapprove the States' 303(d) Lists if the States Fail to Evaluate All Relevant Data** ....................................................................................................3

       A.   Washington Ignored its Own Data Showing Marine Acidity Levels .........................3

       B.   Washington's Data Showed Repeated Water Quality Violations............................5

       C.   This Court May Take Judicial Notice of WDE's Data ................................7

       D.   Washington's Claims of Data Unreliability Ring Hollow .........................9

   **II.**   **Both Washington and Oregon are Violating the Narrative Criteria for Their Marine Waters** ............................................................................................12

       A.   Both States Employ Narrative Criteria for pH in Marine Waters...........................12

       B.   Washington Violated its Narrative Criteria Because Native Shellfish Populations are at Risk .........................................................................13

       C.   Oregon Violated Its Water Quality Standards Because the Altered pH of its Marine Waters is Harming its Commercially Important Fish and Shellfish ........................14

**CONCLUSION** ............................................................................................................15

**APPENDIX A** .............................................................................................................17

BRIEF OF *AMICUS* PCFFA                      NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                   357 E. Chicago Ave.
(2:13-cv-01866-JLR)                             Chicago, IL 60611
                                           (312) 503-7983

ii

# TABLE OF AUTHORITIES

**Cases**

*American Canoe Ass'n v. USEPA,* 30 F.Supp.2d 908 (E.D. Va. 1998) ............................................ 4

*Ass'n of Irritated Residents v. U.S. E.P.A.,* 686 F.3d 668 (9th Cir. 2012) ..................................... 11

*Fund for Animals v. Williams*, 391 F.Supp.2d 191 (D.D.C. 2005) .................................................. 8

*Haines v. Home Depot*, 2012 U.S. Dist. LEXIS 47967 (E.D. Cal. Apr. 4, 2012) ........................ 7-8

*Newton v. Holland*, 2014 U.S. Dist. LEXIS 10625, (E.D. Ky. Jan. 29, 2014) ............................... 7

*Pronsolino v. Nastri*, 291 F.3d 1123 (9th Cir. 2002) ..................................................................... 15

*Center for Biological Diversity v. United States BLM*, 2007 U.S. Dist. LEXIS 81114 (N.D. Cal. Oct. 18, 2007) .............................................................................................................................. 8

*Sierra Club v. U.S. E.P.A.,* 671 F.3d 955 (9th Cir. 2012) .............................................................. 11

*Sierra Club, Inc. v. Leavitt*, 488 F.3d 904 (11th Cir. 2007) .......................................................... 11

*Southwest Ctr. For Biological Diversity v. US Forest Service*, 100 F.3d 1443 (9th Cir. 1996) ........ 8

*United States v. 14.02 Acres of Land,* 530 F.3d 883 (9th Cir. 2008) ............................................. 7

**Statutes**

33 U.S.C. 1313(d) ........................................................................................................................... 4

**Regulations**

40 C.F.R. 130.7(d)(2) .................................................................................................................. 4-5

40 CFR 130.7(b) ..................................................................................................................... 1-2, 4-5

40 CFR 130.7(b)(3) ........................................................................................................................ 13

40 CFR 130.7(b)(5) .................................................................................................................. passim

40 CFR 130.7(b)(6)(iii) .................................................................................................................. 12

40 CFR 130.7(d)(2) .......................................................................................................................... 2

40 C.F.R. 131.11(a)(1) ................................................................................................................... 13

BRIEF OF *AMICUS* PCFFA                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                   357 E. Chicago Ave.
(2:13-cv-01866-JLR)                        Chicago, IL 60611
                                           (312) 503-7983

1

OAR 340-041-0007(11)....................................................................................................13

OAR 340-041-0011 .........................................................................................................13

WAC 173-201A-210(1)(f).............................................................................................12

WAC 173-201A-260(2)(a).............................................................................................13

WAC 173-201A-612.........................................................................................................5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

**INTRODUCTION**

For years, the United States Environmental Protection Agency (EPA), Washington Department of Ecology (WDE), and Oregon Department of Environmental Quality (ODEQ) possessed data showing dangerous acidity levels in the coastal waters of the Pacific Northwest—levels that violated the states' water quality standards.  WDE in particular possessed this data because it was generated by its own monitoring stations.  Nonetheless, WDE, by its own admission, failed to evaluate its own data when preparing its mandatory list of impaired water bodies under the Clean Water Act (CWA).  This alone requires remanding the case.  EPA may only approve a state's list if the state meets all the requirements of 40 CFR 130.7(b), including the requirement to "assemble and evaluate *all* existing and readily available water quality-related data and information" under 130.7(b)(5) (emphasis added).

WDE and ODEQ have also turned a blind eye to the numerous shellfishery collapses and other stark evidence of a coastline in danger.  These dangers have now reached a critical juncture, not only for the region's $200 million shellfish industry but also for thousands of commercial fishing families and the multi-billion dollar fishing industry vital to the economies of the Pacific Northwest.  The purpose of the CWA's water quality impairment listing is to serve as an informational tool—to allow states to plan how best to deal with such critical pollution problems.  But this tool is rendered impotent if the agencies are free to ignore their own data showing the mounting threat.

**STATEMENT OF INTEREST**

*Amicus* Pacific Coast Federation of Fishermen's Associations (PCFFA) is a U.S. west-coast-based commercial fishing industry trade association representing the interests and fishing heritage of approximately 1,000 commercial fishing families who depend on healthy oceans for

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

1

all or a portion of their livelihoods.  The Southern California Trawlers' Association is a member of PCFFA and is a fishermen's marketing and resource protection organization representing the interests of the Southern California trawler fleet, which harvests migratory fish affected by ocean acidification in the Pacific Northwest.  The Institute for Fisheries Resources is the marine resource protection and conservation affiliate of PCFFA, working to restore valuable west coast fisheries and the aquatic habitats they rely upon.  The economic interests of *amici* (collectively "PCFFA") are directly affected when the marine waters off the coasts of Washington and Oregon violate the relevant water quality criteria under the CWA.[1]

## SUMMARY OF ARGUMENT

The EPA "*shall* approve [a 303(d) list] . . . *only if* it meets the requirements of 130.7(b)." 40 CFR 130.7(d)(2) (emphases added).  One of those requirements is that states "assemble *and evaluate all* existing and readily available water quality-related data and information…." 40 CFR 130.7(b)(5) (emphasis added).

Here, the State of Washington, by its own admission, failed to consider the data generated by its own monitoring stations.  This was true even after the Center for Biological Diversity specifically requested that it include such data in its analysis.

This data is quite damning.  Thousands of samples have measured pH beyond the required range, demonstrating repeated water quality violations in the marine waters of the Pacific Northwest.  They show an ocean environment in grave danger, with acidity readings up to 10 times more corrosive than the allowable standards, and getting worse over time.

---

[1]  No party or party's counsel authored this brief, in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.  In addition, no person—other than *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

Indeed, a large portion of the Pacific Northwest's valuable ocean fisheries are now increasingly at biological (and thus economic) risk because of ocean acidification.  According to the federal report *Fisheries Economics of the US (2012)* (FEUS 2012), in 2012 alone the Pacific Northwest's seafood industry created generated $1.2 billion in sales impacts in Oregon, supporting an estimated 16,051 family wage jobs, and another $7.5 billion in sales impacts in Washington, supporting an estimated 60,955 family wage jobs.[2]  The Oregon and Washington shellfish and crab components of that industry—species particularly susceptible to carbonate-based shell losses from increasingly acidic waters—together accounted in 2012 for $240 million in direct landing revenues, with much greater economic impacts as those products traveled the chain of commerce to the consumer.[3]

While the science behind ocean acidification is beyond the scope of the purely legal issues of this brief, the science now clearly shows that, while carbonate-shelled sea creatures are most immediately vulnerable to increasing ocean acidification, *nearly every marine species* could eventually be adversely affected.  Because zooplankton are at particular risk—and because they are the food source for vast ocean ecosystems—their demise could trigger a collapse of the ocean food webs upon which so many marine species, including billions of humans, depend.[4]

## ARGUMENT

I.  **EPA Must Disapprove the States' 303(d) Lists if the States Fail to Evaluate All Relevant Data**

A.  **Washington Ignored Its Own Data Showing Marine Acidity Levels**

---

[2]  *See Fisheries Economics of the US (2012)* (FEUS 2012) (Pacific Report), at 28, available at: http://www.st.nmfs.noaa.gov/Assets/economics/documents/feus/2012/FEUS2012_Pacific.pdf
[3]  *Id.* at 33, 36.
[4]  For the scientific and economic implications of ocean acidification to fragile ocean ecosystems, see: *Ocean Acidification: A National Strategy to Meet the Challenges of a Changing Ocean* (2010), National Research Council of the National Academy of Science, http://dels.nas.edu/Report/Ocean-Acidification-National-Strategy/12904.

BRIEF OF *AMICUS* PCFFA                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                                   357 E. Chicago Ave.
(2:13-cv-01866-JLR)                                          Chicago, IL 60611
                                                              (312) 503-7983

3

The CWA assigns EPA the critical role of reviewing state 303(d) lists of impaired waterways. 33 U.S.C. 1313(d).  As the regulations make clear, EPA "*shall* approve [a 303(d) list] . . . *only if* it meets the requirements of 130.7(b)." 40 C.F.R. 130.7(d)(2) (emphases added). Among the requirements that EPA must oversee is the mandatory duty of states to "assemble and evaluate *all* existing and readily available water quality-related data and information…." 40 CFR 130.7(b)(5) (emphasis added).  This regulation "cannot be read as anything other than mandatory; it sets out a list of required elements for state § 303(d) submissions and states that the administrator 'shall' only approve a list that includes all required elements." *American Canoe Ass'n v. USEPA,* 30 F. Supp.2d 908, 918 (E.D. Va. 1998).

By its own admission, Washington violated this mandatory duty, which in turn required EPA, under its own regulations, to disapprove the state's list.  *See id.* ("When the word 'shall' appears in a statute, it is generally construed as mandatory, leaving no room for agency discretion," and the same applies to 40 C.F.R. 130.7(b)).  Washington has been monitoring pH levels in its marine waters for decades.  WA-000813.  The Center for Biological Diversity, in its comments on the draft 2010 assessment of Washington's marine waters, specifically pointed out that Washington possessed long-term monitoring data "which could prove extremely useful for monitoring the impact of ocean acidification…." *Id.*  Yet WDE chose not to evaluate its own data in making its listing decision.  When Washington responded to the Center for Biological Diversity's comments, it admitted that such data "was not used for the Water Quality Assessment." WA-000068-000069.  EPA itself was aware of this.  WA-000070 (copying Jill Gable, USEPA).  Even so, EPA did not review WDE's data when it reviewed Washington's listing decision.  WA-000021 (list of references reviewed by EPA).  Thus WDE, by its own admission, failed to evaluate "all existing and readily available water quality-related data," which

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

4

in turn triggered a mandatory duty on the part of EPA to disapprove its list.  *See* 40 C.F.R. 130.7(d)(2)  (EPA "*shall* approve [a 303(d) list] . . . *only if* it meets the requirements of 130.7(b)") (emphases added).  On this basis alone, EPA's approval must be remanded.

### B.   Washington's Data Showed Repeated Water Quality Violations

The data that WDE and EPA ignored is particularly damning.  It shows repeated and worsening water quality violations related to the state's marine pH standard.

Washington has adopted a numeric criterion for pH of its marine waters. A pH number is a measure of acidity that is measured on a logarithmic scale ranging from 0 (most acidic) to 14 (most alkaline), with a pH of 7.0 defined as chemically neutral.  In Washington, virtually all marine waters are designated "extraordinary" or "excellent" or "good" quality (*see* WAC 173-201A-612), where the pH *must* be within the range of 7.0 to 8.5.  WAC 173-201A-210(1)(f).  A single water sample that falls outside this range is called an *excursion*.  WA-001416.  A water quality *violation* occurs if two criteria are met:  (1) a minimum of three excursions exist from all data considered, and (2) at least ten percent of all "values"[5] in a given year do not meet the criterion.  WA-001400.  Furthermore, if a water body meets these criteria for a water quality violation, that water body is identified as a "Category 5" quality-impaired water body.  *Id.*  A Category 5 water body *must* be included in the list of quality-impaired water bodies submitted by the state to EPA.  WA-000012.

For years, WDE's data showed widespread, and ongoing, water quality violations of the State's pH criterion.  According to the data published on WDE's own website, fully 61 out of 79 monitoring stations from 1989 to 2012 experienced water quality violations sufficient for

---

[5]  "Value" apparently refers to "daily value," which is defined as the most extreme excursion sample for each day of monitoring. WA-001399.

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

5

Category 5 designation—and hence mandatory listing under 303(d).[6]  Twenty-six of those 61 stations found water quality violations based on pH levels that were too acidic—in other words, where pH fell below 7.0.[7]  In 2013 alone, 9 different stations recorded water quality violations requiring listing, based on nearly *2,000* excursions for those stations alone.[8]

The problem of ocean acidification has become markedly worse over time.  This is clear from the increasing prevalence of excursions that can lead to violations.  For example, in 1991, only 1 out of 45 monitored stations experienced low-end (acidic) pH excursions, and the extent of those excursions was not severe enough for a Category 5 designation.[9]  Ten years later, in 2001, 5 out of 35 monitored stations experienced low-end (acidic) pH excursions.[10]  By 2011, the number of excursions had skyrocketed.  Based on a conservative analysis,[11] in 2011, for the first time in history, 24 out of the 35 total stations that were monitored recorded at least one acidic excursion.[12]

Washington's Coastal Estuaries region has been especially prone to ocean acidification.[13]  For example, the pH at GYS004 station (Grays Harbor – Chehalis R.) was measured below 7.0, as low as 5.8, *1,213 times* (i.e., excursions) during seventy-three months between 1990 and

---

[6] Washington Dept. of Ecology, Long-Term Marine Water Quality Data, http://www.ecy.wa.gov/apps/eap/marinewq/mwdataset.asp (last visited July 23, 2014) [*hereinafter Database*].

[7] *See id.*

[8] *See id.;* Appendix A, Table 1.

[9] *See id.* (GYS004 station).

[10] *See id.* (Stations are:  BLL009, HCB007, PAH003, PSB003, and GYS004).

[11] Even the samples with invalid or no pH data were accounted for in calculating the total number of samples, underestimating the percentage of excursions over total.

[12] *See Database, supra* note 6. (Stations are:  BUD005, CMB003, CRR001, CSE001, DNA001, DYE004, ELB015, ELD001, GOR001, HCB003, HCB004, HCB010, NSQ002, OAK004, PSB003, SIN001, TOT001, GYS004, GYS008, GYS016, WPA001, WPA003, WPA004, WPA006).

[13] While the Coastal Estuaries are often close to river outlets, and thus vulnerable to land-based pollution, the source of a pH violation does not matter for purposes of 303(d) listing.  WA-001124. (EPA expects the water body to be listed even if "the source-stressor is unknown" or includes "nutrient enrichment", "industrial discharge", or "natural background").

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

2012.[14]  Every year from 1992 to 2012, with the exception of 2009, this water body experienced a sufficient number of pH excursions to constitute a violation requiring listing under 303(d).[15]  Willapa Bay (WPA001) station, situated roughly 30 miles from Oregon's border, has likewise shown numerous pH violations over the years.  WDE's own data show that this water body experienced a water quality violation related to pH in 1995, 1996, 1997, 1999, 2007, 2010, and 2012, with a close call in 2011.[16]  Virtually all of those violations were at the low-end of the range—i.e., were because the ocean was too acidic.[17]

Washington's own data thus compelled the State, under its own policy, to list numerous of its marine waters on its 303(d) list.

### C.      This Court May Take Judicial Notice Of WDE's Data

WDE's data is publicly accessible on its own website.  As such, it is self-authenticating and subject to judicial notice.  The Ninth Circuit has made clear that "[j]udicial notice is appropriate for records and reports of administrative bodies."  *United States v. 14.02 Acres of Land*, 530 F.3d 883, 894 (9th Cir. 2008) (citation and internal quotations omitted); *see also Newton v. Holland*, 2014 U.S. Dist. LEXIS 10625, at *2-3 n.1 (E.D. Ky. Jan. 29, 2014) ("records and information located on government websites are self-authenticating under Fed. R. Evid. 902"); *Haines v. Home Depot*, 2012 U.S. Dist. LEXIS 47967, at *26 (E.D. Cal. Apr. 4, 2012)

---

[14] *Database*, *supra* note 6 (Select "coastal estuaries" as the station group; select "GYS004" from the scroll-down menu; select "csv" as the format; select "all years" as the time span; and then click "get file".).  Because pH is on a logarithmic scale, a pH of 6.0 is ten times more acidic than a pH of 7.0—the lower end of the numeric criterion for pH.

[15] *See Database*, *supra* note 6; *see also* Appendix A, Table 2.

[16] *See Database*, *supra* note 6 (Select "coastal estuaries" as the station group; select "WPA001" from the scroll-down menu; select "csv" as the format; select "all years" as the time span; and then click "get file".); *see also* Appendix A, Table 3.

[17] *See Database*, *supra* note 6.

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

1   ("Federal courts consider records from government websites to be self-authenticating under Rule

2   902(5)").

3          Even if the data were not an administrative record on the government's own website, this

4   Court should nonetheless recognize it because "[t]he agency may not skew the record in its favor

5   by excluding pertinent but unfavorable information." *Fund for Animals v. Williams*, 391

6   F.Supp.2d 191, 197 (D.D.C. 2005) (citation omitted); *see also Center for Biological Diversity v.*

7   *United States BLM*, 2007 U.S. Dist. LEXIS 81114 (N.D. Cal. Oct. 18, 2007), at *13 (same).

8   Indeed, "[s]upplementation of the record may be necessary when an agency excludes

9   information adverse to its position from the administrative record." 391 F.Supp.2d at 197.  Even

10  if the agency argues that certain data was not relied upon because it "was incomplete or

11  inaccurate, that does not mean it is irrelevant" to the agency's decision.  2007 U.S. Dist. LEXIS

12  81114, at *15 (holding that data should be admitted into the record).

13         Moreover, where there is a requirement that a state evaluate *all* the data, a violation of

14  that requirement must by necessity include extra-record evidence.  Indeed, it is the very fact that

15  such data is *not* in the record that forms the basis for the present legal challenge.  The Ninth

16  Circuit has made clear that judicial review may encompass extra-record materials "if necessary

17  to determine whether the agency has considered all relevant factors and has explained its

18  decision." *Southwest Ctr. For Biological Diversity v. US Forest Service*, 100 F.3d 1443, 1450

19  (9th Cir. 1996) (citation and internal quotations omitted).

20          Here, WDE admitted that it failed to consider all the data, as noted *supra*, and such data

21  is extremely adverse to its position.  As such, this Court is more than justified in considering it.

BRIEF OF *AMICUS* PCFFA                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                              357 E. Chicago Ave.
(2:13-cv-01866-JLR)                                      Chicago, IL 60611
                                                         (312) 503-7983

8

### D.      Washington's Claims of Data Unreliability Ring Hollow

Washington's only stated reason for not using its own data was that it "could be subject to large (+/- 0.5 pH units), non-quantifiable error and [is] inadequate to assess changes in pH due to anthropogenic contribution."  WA-000069.  This argument should be rejected on its face. *First*, WDE never made any attempt to gather more reliable data.  The state is simply having its cake and eating it too—conducting the necessary monitoring yet choosing to ignore the results when they show problems.  If states are free to exclude their own data simply by making vague claims of "non-quantifiable error," yet must never then obtain more reliable data, the states are essentially free to capriciously ignore the requirement to "evaluate all existing and readily available water quality-related data" under 40 CFR 130.7(b)(5).  Indeed, WDE's own guidelines suggest that it should not exclude data simply because there might, given unlimited resources, be better data to be had.  WDE's Water Quality Program Policy 1-11, revised July 2012, clearly states that while "[c]ontinuous monitoring [of pH] is preferred," "until improved technology leads to more projects incorporating continuous pH measurements, Ecology recognizes that most pH monitoring is performed as single sample events."  WA-001399.

*Second*, the argument is contradicted by the facts published on WDE's own website.  As noted, WDE made vague claims that its electrode sensors were subject to a "non-quantifiable" error range of +/-0.5 pH unit.  Elsewhere, however, WDE has claimed a much lower error range, stating that its pH data are collected using a high-resolution glass electrode sensor with error range of just 0.1 pH unit.[18]  This much smaller error range is only confirmed by the sensor's

---

[18] *See* Washington Dept. of Ecology, Stream Sampling Protocols for the Environmental Monitoring and Trends Section, 25 (Oct. 2001), *available at* https://fortress.wa.gov/ecy/publications/publications/0103036.pdf; Washington Dept. of Ecology, Washington State Marine Water Quality, 1998 through 2000, 13 (Dec. 2002), *available at* https://fortress.wa.gov/ecy/publications/publications/0203056.pdf

BRIEF OF *AMICUS* PCFFA                                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                                                  357 E. Chicago Ave.
(2:13-cv-01866-JLR)                                                        Chicago, IL 60611
                                                                          (312) 503-7983

9

manufacturer.[19]  Indeed, there is nothing in the Administrative Record to demonstrate why this much smaller error range is wrong.  The only thing WDE claimed was that it "conducted an assessment of pH data via electrode probe, performing comparative analyses" during a NOAA research voyage.  WA-000069.  This vague analysis was the only basis for excluding decades of data from multiple monitoring stations—data that WDE and the sensor manufacturer had both previously agreed was subject to a different, smaller error range.  WDE's analysis also ignores the fact that any individual measurement error, which can take either positive or negative value, would largely be eliminated in statistically robust samples such as the one in WDE's database, where those errors either way would tend to cancel each other out.

*Third*, even if the +/- 0.5 pH error range were true, and even if it *only* worked to over-count the violations in *every* case, WDE's data *still* show numerous pH violations outside this supposed range.  In other words, even if WDE's data were restricted to readings below 6.5 pH units (beyond even the full claimed 0.5 pH unit error range), there still would have been 16 water quality violations at 6 different stations between 1989 and 2012.[20]  At the GYS004 station alone, there were 11 extreme acidic violations and *260* extreme acidic excursions below 6.5 pH from 1990 to 2012.[21]  These violations reflect extreme pH violations that cannot be statistically accounted for by any supposed 0.5 pH error range.  Again, the fact that WDE did not even evaluate its own data meant that it deliberately blinded itself to these extreme and undisputed water quality violations.

---

[19]  *See* http://www.ecy.wa.gov/apps/eap/marinewq/helpnotes/param_descriptions.html (describing the pH meter used in Washington since 1989 as the SeaBird SBE 18 sensor), and http://www.seabird.com/products/spec_sheets/18data.htm (describing the SeaBird SBE 18 as having an accuracy of +/- 0.1 pH).
[20]  *See* database, *supra*, note 6; Appendix A, Table 4.
[21]  *See* database, *supra*, note 6; Appendix A, Table 4.  Table 4 reflects 215 extreme excursions at GYS004 in years that had enough extreme excursions to constitute water quality violations.  In addition, GYS004 recorded 45 extreme excursions in other years (8 in 1990, 3 in 2001, 4 in 2002, and 30 in 2011).

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

*Fourth*, even if WDE's supposed "large" error range were true, it still would not relieve WDE of the mandatory duty to at least *evaluate* the data.  Similar broad-brush claims of unreliability were dismissed by the court in *Sierra Club, Inc. v. Leavitt*, which distinguished *using* the data from *evaluating* it, and made clear that even if some of the data were unreliable "it does not obviate the requirement in § 130.7(b)(5) that [a state] *evaluate* all existing and readily available data."  *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 913 (11th Cir. 2007) (holding that "states are required by the CWA to identify *all* waterbodies that fail to meet water quality standards" and "cannot shirk this responsibility simply by claiming a lack of current data") (emphases in original).  Courts have consistently held the agency to a similar standard in other contexts.  *See Ass'n of Irritated Residents v. U.S. E.P.A.,* 686 F.3d 668, 677 (9th Cir. 2012) ("[T]he question is . . . whether EPA has unlimited discretion to ignore evidence indicating an existing SIP [under the Clean Air Act] might be substantially inadequate and choose to do nothing.  We believe EPA's failure to act in light of strong evidence . . . is arbitrary and capricious"); *Sierra Club v. U.S. E.P.A.,* 671 F.3d 955, 968 (9th Cir. 2012) (reviewing EPA approval of a SIP, the Court held that "EPA's failure to even consider the new data and to provide an explanation for its choice rooted in the data presented was arbitrary and capricious").  The rationale of these cases is similar to the one presented here.  If an agency can categorically ignore data by making the vaguest of unreliability claims, then any requirement to evaluate *all* relevant data becomes meaningless.

*Fifth,* and finally, WDE's claim of error is not even relevant to the present argument.  WDE claimed that the supposed "non-quantifiable error" made the data "inadequate to assess changes in pH *due to anthropogenic contribution*."  WA-000069 (emphasis added).  WDE is apparently referring to a secondary pH criterion, which is that *within* the 7.0 to 8.5 pH range,

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

11

there can be no more than 0.2 units of human-caused variation for "extraordinary" quality waters.  WAC 173-201A-210(1)(f).  However, WDE apparently ignored the fact that the 7.0 to 8.5 range itself is an absolute one that does *not* depend on whether the pH change is human-caused.  Indeed, EPA itself, in its guidelines, has stated that "if marine pH exceeds the State's criterion, but the source-stressor is unknown (e.g., carbon deposition, nutrient enrichment, industrial discharge, natural background), then EPA *expects the segment to be listed*."  WA-001124 (emphasis added).  In other words, the state excluded its own pH data on the basis that it was inadequate to assess the *secondary* pH criterion (that of human-caused change), while ignoring the fact that there is a *primary* pH criterion that does not depend on such change and that its own data shows has been violated many times over many years.

*In sum*, even though 40 CFR 130.7(b)(6)(iii) allows states to submit a "rationale for any decision to not *use* any existing and readily available data and information for any one of the categories of waters as described in § 130.7(b)(5)" (emphasis added), it does not give states unfettered discretion to categorically refuse to *evaluate* that data when compiling their 303(d) lists.  This is especially true when the state never attempted to gather more reliable data, when its own website contradicts its unreliability claims, when there are numerous extreme violations that cannot be accounted for by any supposed error, and when its unreliability claim is not even directed at the relevant criterion.

## II.   Both Washington and Oregon Are Violating The Narrative Criteria For Their Marine Waters

### A.   Both states employ narrative criteria for pH in marine waters

Even if the data did not show repeated water quality violations, the marine waters at issue would still have to be listed as "impaired" under both states' narrative standards.  Washington applies the following narrative criteria to water quality standards regarding pH:  "Toxic,

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

12

radioactive, or deleterious material concentrations must be below those which have the *potential*, either singularly or cumulatively, to adversely affect characteristic water uses, cause acute or chronic conditions to the *most sensitive biota* dependent upon those waters, or adversely affect public health." WAC 173-201A-260(2)(a) (emphases added).  Oregon's narrative criteria require waters to "be of sufficient quality to support aquatic species without detrimental changes in the resident biological communities." OAR 340-041-0011.  Further, Oregon's water quality standards are meant to prevent "conditions . . . deleterious to fish or other aquatic life." OAR 340-041-0007(11).  The EPA regulations, which apply to both states, stress that "for waters with multiple use designations, the criteria shall *support the most sensitive use*." 40 CFR 131.11(a)(1) (emphasis added).  States must use these narrative criteria to evaluate their coastal waters and determine whether they should be listed under 303(d).  *See* 40 CFR 130.7(b)(3) (water quality standards for listing include narrative criteria).  Yet the EPA approved lists from Washington and Oregon that did not take those states' narrative criteria into account.

### B.   Washington violated its narrative criteria because native shellfish populations are at risk

Ocean acidification is more than just a matter of pH numbers.  Increasing acidity endangers marine calcifiers upon which vast food systems depend.  Calcifiers are small animals, such as oysters, crab, or shrimp, that form shells or skeletons from calcium carbonate, which is a naturally abundant compound in healthy marine waters.  WA-000712 (Blue Ribbon Report, at xii).  However, as marine water pH declines in the process of acidification, the quantity of dissolved calcium carbonate also declines, making it difficult for calcifiers to form shells.  *Id*. Washington's waters are also home to calcifying zooplankton, such as many species of krill, which are vital to the diets of much larger marine animals.  When the zooplankton population plummets, as it does under acidic conditions, this endangers the basic food source of whole

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

13

populations of native Pacific Northwest marine animals that depend on plankton for survival. WA-001005-001006.

The dangers posed by decreased marine pH directly threaten the Washington shellfishing industry and the families whose livelihoods depend on this industry.  Annually, farmed shellfish have an economic value of over $1.7 billion in Washington, and shellfish growers employ over 3,200 people in the state.[22]  In addition, wild shellfish harvests account for over two-thirds of the value of Washington's wild fisheries.  Blue Ribbon Report, at 4.  Acidifying ocean waters cause shellfish to grow more slowly or not at all, and greatly increase their mortality.  Although shellfish of every age are at risk, young shellfish are particularly vulnerable.

As a result of accelerating ocean acidification, shellfisheries in the Pacific Northwest will likely have fewer mature shellfish available to harvest, and Washington stands to lose much of the $1.7 billion in gross profits from wild and farmed shellfishing.  Blue Ribbon Report, at 5.  In fact, in 2008, Taylor Shellfish Farms lost 60% of the young oysters at its Washington hatchery.[23]  Also, beginning in 2005, corrosively acidic water from Willapa Bay was drawn into the Goose Point Oyster Co.'s hatchery.  Every year since then, this water has killed the young oysters in the hatchery, forcing Goose Point in 2012 to relocate much of its production to Hawaii to find non-acidified waters in which to raise healthy oysters.[24]

### C.    Oregon violated its water quality standards because the altered pH of its marine waters is harming its commercially important fish and shellfish

The CBD presented Oregon and the EPA with a clear case of ocean acidification-driven population decline, in violation of Oregon's narrative criteria.  Whiskey Creek Shellfish

[22]  Washington Shellfish Initiative, at 1, pcsga.org/shellfish-initiative/.
[23]  Jennifer Langston, *Trouble on the Half Shell*, SIGHTLINE DAILY, June 22, 2011, at 3.
[24]  Craig Welch, *Sea Change: Oysters dying as coast is hit hard*, SEATTLE TIMES, September 11, 2013, accessed at http://apps.seattletimes.com/reports/sea-change/2013/sep/11/oysters-hit-hard/.

BRIEF OF *AMICUS* PCFFA                                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                                   357 E. Chicago Ave.
(2:13-cv-01866-JLR)                                        Chicago, IL 60611
                                                           (312) 503-7983

14

Hatchery, which gets its water from coastal Oregon waters in Netarts Bay, is one of the nation's largest oyster producers. The Hatchery lost several billion oyster larvae in 2008 during upwelling, a process that brings acidified waters to the surface. OR1-000312. When water is more acidic, the young oysters must necessarily spend more energy building up their shells. *Id.* This energy expenditure leads to a 5% increase in daily mortality rates for young oysters. *Id.*

In addition to shellfish, Oregon's fish population, including the state fish, salmon, is also endangered by ocean acidification. Decreased pH in the water harms fishes' blood circulation, potentially leading to deadly cardiac failure. Ishimatsu 2004, at 737-738. Many other commercially harvested fish species also rely on the food web in Oregon's marine waters, and acidification of these waters threatens to destroy this web. Salmon, for example, depend for food on calcifying plankton called pteropods. With fewer surviving pteropods, the salmon are at greater risk of death from lack of food, threatening all the regional economies those salmon runs support. Blue Ribbon Report, at 17, 21; WA-001009-001010.

These threats are precisely the ones that the CWA's 303(d) lists are meant to inform the agencies and the general public about. The Ninth Circuit described the listing requirement under 303(d) as an "information-gathering provision . . . § 303(d) is structurally part of a set of provisions governing an interrelated goal-setting, information-gathering, and planning process." *Pronsolino v. Nastri*, 291 F.3d 1123, 1138 (9th Cir. 2002). When the agencies short-circuit this planning process by ignoring their own data and evidence of such a grave and mounting threat, then these agencies have violated the law.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiff's motion for summary judgment and deny defendant's motion for summary judgment.

BRIEF OF *AMICUS* PCFFA                                  NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                                          357 E. Chicago Ave.
(2:13-cv-01866-JLR)                                                Chicago, IL 60611
                                                                    (312) 503-7983

15

1

2

3 DATE:  August 28, 2014                Respectfully submitted,

4                                        /s/ *Michael Barsa*

5                                        Michael Barsa (*Pro hac vice*, CA Bar No. 196043)

6                                        NORTHWESTERN LAW SCHOOL

7                                        357 E. Chicago Ave.
                                         Chicago, IL 60611

8                                        Phone: (312) 503-7983
                                         Facsimile: (312) 503-5950

9                                        Email: m-barsa@law.northwestern.edu

10

11                                       Glen H. Spain (*Pro hac vice*, CA Bar No. 88097)
                                         General Legal Counsel, Pacific Coast Federation of

12                                       Fishermen's Associations, Southern California Trawlers'
                                         Association, and the Institute for Fisheries Resources

13                                       P.O. Box 11170
                                         Eugene, OR 97440-3370

14                                       Phone:  (541) 689-2000

15                                       Facsimile:  (541) 689-2500
                                         Email:  fish1ifr@aol.com

16

17                                       /s/  *Elizabeth Zultoski*
                                         Elizabeth Zultoski (WA Bar No. 44988)

18

19                                       SMITH & LOWNEY, PLLC
                                         2317 E. John St.

20                                       Seattle, WA 98112
                                         Phone:  (206) 860-2883

21                                       Facsimile: (206) 860-4187
                                         Email:  elizabethz@igc.org

22

23

24

25

26

27

28

BRIEF OF *AMICUS* PCFFA                    NORTHWESTERN LAW SCHOOL
IN SUPPORT OF PLAINTIFFS                              357 E. Chicago Ave.
(2:13-cv-01866-JLR)                                    Chicago, IL 60611
                                                        (312) 503-7983

16

1

2

## APPENDIX A

3

4

Table 1:  Excursions and Violations by Stations in 2013

| Station | Total Excursions | Total Samples | Total Daily Values | Daily Value Excursions | Percentage |
|---------|-----------------|---------------|-------------------|----------------------|-----------|
| GYS004 | 30 | 320 | 10 | 1 | 10.00% |
| ADM001 | 882 | 2781 | 11 | 2 | 18.18% |
| ADM002 | 128 | 1511 | 10 | 3 | 30.00% |
| GRG002 | 268 | 3619 | 10 | 3 | 30.00% |
| HCB003 | 274 | 2830 | 11 | 7 | 63.64% |
| HCB004 | 114 | 1154 | 11 | 6 | 54.55% |
| HCB007 | 45 | 439 | 11 | 4 | 36.36% |
| HCB010 | 181 | 2309 | 12 | 8 | 66.67% |
| PTH005 | 50 | 525 | 11 | 5 | 45.45% |

Table 2:  Violations at GYS004—All Years

| Year | Total Excursions | Total Samples | Total Daily Values | Daily Value Excursions | Percentage |
|------|-----------------|---------------|-------------------|----------------------|-----------|
| 1992 | 52 | 188 | 8 | 3 | 37.5% |
| 1993 | 53 | 167 | 8 | 3 | 37.5% |
| 1994 | 39 | 183 | 8 | 4 | 50.0% |
| 1995 | 36 | 214 | 10 | 2 | 20.0% |
| 1996 | 88 | 240 | 11 | 5 | 45.5% |
| 1997 | 48 | 216 | 12 | 3 | 25.0% |
| 1998 | 22 | 199 | 11 | 2 | 18.2% |
| 1999 | 104 | 187 | 11 | 9 | 81.8% |
| 2000 | 18 | 176 | 10 | 1 | 10.0% |
| 2001 | 22 | 188 | 12 | 4 | 33.3% |
| 2002 | 58 | 176 | 7 | 3 | 42.9% |
| 2003 | 161 | 265 | 11 | 7 | 63.6% |
| 2004 | 78 | 250 | 7 | 4 | 57.1% |
| 2005 | 143 | 219 | 7 | 5 | 71.4% |
| 2006 | 15 | 197 | 7 | 2 | 28.6% |
| 2007 | 61 | 272 | 10 | 3 | 30.0% |
| 2008 | 32 | 318 | 9 | 3 | 33.3% |
| 2010 | 30 | 288 | 9 | 2 | 22.2% |
| 2011 | 75 | 326 | 11 | 4 | 36.4% |
| 2012 | 55 | 255 | 10 | 3 | 30.0% |

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

17

Table 3:  Violations and Close Calls at WPA001—All Years

| Year | Total Excursions | Total Samples | Total Daily Values | Daily Value Excursions | Percentage |
|------|------------------|---------------|--------------------|------------------------|------------|
| 1995 | 20 | 169 | 11 | 2 | 18.2% |
| 1996 | 47 | 170 | 11 | 4 | 36.4% |
| 1997 | 37 | 197 | 12 | 2 | 16.7% |
| 1999 | 10 | 101 | 9 | 1 | 11.1% |
| 2007 | 21 | 186 | 10 | 1 | 10.0% |
| 2010 | 13 | 161 | 9 | 1 | 11.1% |
| 2011 | 17 | 178 | 11 | 1 | 9.1% |
| 2012 | 17 | 165 | 10 | 1 | 10.0% |

Table 4:  Extreme Violations—All Stations

| Station | Year | Total Extreme Excursions | Total Samples | Total Daily Values | Daily Value Extreme Excursions | Percentage |
|---------|------|--------------------------|---------------|--------------------|--------------------------------|------------|
| OAK004 | 2005 | 42 | 312 | 12 | 2 | 16.7% |
| PAH003 | 2001 | 33 | 326 | 9 | 1 | 11.1% |
| PTH005 | 2005 | 15 | 961 | 10 | 1 | 10.0% |
| SIN001 | 2005 | 40 | 302 | 11 | 2 | 18.2% |
| GYS004 | 1994 | 2 | 183 | 8 | 1 | 12.5% |
| GYS004 | 1995 | 10 | 214 | 10 | 1 | 10.0% |
| GYS004 | 1996 | 38 | 240 | 11 | 3 | 27.3% |
| GYS004 | 1997 | 22 | 216 | 12 | 3 | 25.0% |
| GYS004 | 1999 | 23 | 187 | 11 | 4 | 36.4% |
| GYS004 | 2003 | 33 | 265 | 11 | 3 | 27.3% |
| GYS004 | 2004 | 7 | 250 | 7 | 1 | 14.3% |
| GYS004 | 2005 | 40 | 219 | 7 | 2 | 28.6% |
| GYS004 | 2007 | 31 | 272 | 10 | 3 | 30.0% |
| GYS004 | 2008 | 3 | 318 | 9 | 1 | 11.1% |
| GYS004 | 2012 | 6 | 255 | 10 | 1 | 10.0% |
| GYS008 | 2002 | 11 | 44 | 6 | 1 | 16.7% |

BRIEF OF *AMICUS* PCFFA
IN SUPPORT OF PLAINTIFFS
(2:13-cv-01866-JLR)

NORTHWESTERN LAW SCHOOL
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-7983

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2014, I electronically filed the Brief of *Amici Curiae* Pacific Coast Federation Of Fishermen's Associations, Southern California Trawlers' Association, and Institute For Fisheries Resources In Support Of Plaintiff Center For Biological Diversity's Motion For Summary Judgment using the CM/ECF system.  Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.


*/s/ Michael Barsa*

Michael Barsa